## ROYAL INS. CO., Limited, et al. v. COMPANIA TRASATLANTICA ESPANOLA.

### Nos. A–11372 to A–11379.

District Court, E. D. New York.

Feb. 24, 1932.

Supplemental Opinion April 8, 1932.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston and Ezra G. Benedict Fox, both of New York City, of counsel), for libelants.

Hunt, Hill & Betts, of New York City (John W. Crandall and John C. Hinkle, both of New York City, of counsel), for respondent.

BYERS, District Judge.

This cause, A–11372, and seven others were tried together under a stipulation in evidence which covers the essential facts. The libelant issued its policy of insurance to a cargo owner, covering a shipment of merchandise ex steamship Montevideo from New York for Barcelona, Spain, leaving September 22, 1927.

Eleven days thereafter, namely, October 3, 1927, at about 10 p. m., intermediate cylinder No. 2 of the quadruple expansion engines broke down; the precise facts, as later found, were that the rings, ring-carrying flange, junk rings, and plate were fractured; the rings had been in the cylinder for eight months, and the other broken elements were six years old. (Incidentally it may be stated that this cylinder had been examined in New York, prior to the commencement of this voyage, and all parts found to be in good condition.)

The engines were at once shut down, leaving the vessel without power.

The ship's position is indicated on respondent's Exhibit C as Lat. 26° 52' North, Long. 8° 46' West, about six miles off the southerly coast of Portugal, southeast of Cape St. Vincent, and southwest of Cape St. Mary. The course at that time had been laid for Cadiz, which was about 130 miles distant.

The cylinders were superimposed, and a

by-pass could not be contrived eliminating the No. 2 intermediate, according to the judgment of the chief engineer, in less than four days. An expert witness at the trial, who had never been on the ship and who did not say that he had examined her plans, gave it as his opinion that this could have been accomplished in twelve hours. Obviously that estimate is not based upon sufficient data to require acceptance.

The master's testimony is not contradicted, that the ship could not be anchored, because of the great depth of water; that there was a current flowing from the Straits of Gibraltar which tended to set the vessel upon the precipitous shore; and that fog or winds, if either had arisen, would have increased the hazard of the ship's position.

A conference of officers was held and resulted in the sending of a radio message at about 4:30 a. m. on the morning of October 4th to the Cadiz office of the respondent. At midnight, the steamship Antonio Lopez, of the same line, arrived from Cadiz, and took the Montevideo in tow to the latter port, where the by-pass was effected.

Arrival at Barcelona occurred on October 11th, and in that city a contract was signed by all consignees and cargo owners in that city, which is in evidence and which gave rise to this litigation. It is an undertaking in reference to general average arising from the said towage, and 5 per cent. of the value of each consignee's or cargo owner's shipment was collected. Payment was refunded to each consignee by the insurance companies issuing the policies, each having in terms admitted the seaworthiness of the ship.

The actual contribution for cargo was about 2.47 per cent., so that 2.52 per cent. or thereabouts was overpaid.

The libelants assert that they are entitled to recover the entire amount paid, because the general average contribution was exacted without right; that is, that the vessel was unseaworthy; if this is not so, that they are entitled to recover the excess payment over the actual contribution established pursuant to the agreement.

The respondent contends that the agreement effectually disposes of the question of the liability of cargo to contribute, as well as of the method whereby the amount of the contribution was ascertained. This means that the question of seaworthiness has been contracted out of the case.

The decision of this controversy will indicate the date as of which the libelant is entitled to recover anything, and the foundation of that right; which will in turn establish the monetary basis upon which recovery is to be computed.

It will be convenient therefore to consider first the scope and legal effect of the contract. The bill of lading did not contain the "Jason" clause, and the only provision which might be thought to apply reads: " * * * the carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the sea, or other waters * * * breakage of shafts, or any latent defect in hull, machinery or appurtenances * * *."

The testimony indicates that a protest was noted by the master, upon arrival at Cadiz, and that he ratified it at Barcelona. The ship arrived in the latter city on October 11th, having departed from Cadiz at 6 p. m. on the 8th.

The agreement in question bears date of October 11th, but whether it was signed on, or as of, that date does not appear. The earliest payments of 5 per cent. were made on October 13th, and the witness Ripol says that he convoked the parties interested in the cargo and the consignees to a meeting at which it was agreed that one Gubern should prepare a document for this purpose, i. e., with respect to obtaining general average deposits from consignees and cargo owners, and the preparation and execution of agreements on their parts for the payment of general average contributions.

The agreement was executed, and for present purposes states:

"We * * * consignees * * * of the goods * * * transported by the Spanish S/S 'Montevideo' * * * hereby bind ourselves to pay the General Average Contributive Share that may result to our respective charge in accordance with General Average Liquidation, which on account of damage to the machinery, and of towage by the S/S 'Antonio Lopez,' of the above mentioned S/S 'Montevideo,' is to be adjusted in accordance with the York Antwerp Rules, 1890, as stipulated in the Bills of Lading; we further bind ourselves to pay prior to delivery of the goods to us and in the character of provisional contribution to the General Average, five per centum of the value of said goods without prejudice to completion of the payment should it be called for when the final rate of contribution is fixed.

"Likewise, availing ourselves of the privilege granted by article 846 of the Code of Commerce, we agree to have the General Av-

erage Liquidation, of the S/S 'Montevideo' made out of Court  *  *  *."

Further, Mr. Gubern was empowered to proceed to the surveys, examinations and valuations required for formulation of the statement, classification and apportionment of the damages.

The respondent contends that the foregoing requires interpretation under the laws of Spain to the effect that the consignees thereby admitted and agreed that they were severally liable to contribute to the general average.

Concededly the law of Spain governed the rights of the parties, and the applicable statutes and decisions have been proved as a question of fact.

The Code of Commerce declares the following with respect to general average:

"Art. 806. For the purposes of this Code the following shall be considered averages:

"1. All extraordinary or accidental expenses which may be incurred during the navigation for the preservation of the vessel or cargo, or both."

"Art. 811. General or gross averages shall be, as a general rule, all the damages and expenses which are deliberately caused in order to save the vessel, her cargo, or both at the same time, from a real and known risk, and particularly the following:  *  *  *" (Towage not specially listed.)

"Art. 812. In order to satisfy the amount of the gross or general averages, all the persons having an interest in the vessel and cargo therein at the time of the occurrence of the average shall contribute."

"Art. 820. The arrival under stress shall not be considered legal in the following cases: *  *  *

"3. If the injury to the vessel should have been caused by reason of her not being repaired, rigged, equipped, and arranged in a convenient manner for the voyage, or by reason of some erroneous order of the captain."

"Art. 846. The persons interested in the proof and liquidation of averages may mutually agree and bind themselves at any time with regard to the liability, liquidation, and payment thereof.

"In the absence of agreements, the following rules shall be observed:

"1. The proof of the average shall take place in the port where the repairs are made, should any be necessary, or in the port of unloading.

"2. The liquidation shall take place in the port of unloading should it be a Spanish port. *  *  *

"4. If the average should have occurred near the port of destination, so that said port can be made, the proceedings treated of in Rules 1 and 2 shall be held there."

"Art. 847. In case of making the liquidation of the averages privately by virtue of agreement, as well as when a judicial authority takes part therein at the request of any of the parties interested who do not agree thereto, all of them shall be cited and heard, should they not have renounced this right."

"Art. 851. At the instance of the captain, the adjustment, liquidation, and distribution of gross averages shall be held privately, with the consent of all the parties in interest.

"For this purpose, within forty-eight hours following the arrival of the vessel at the port, the captain shall call all the persons interested, in order that they may decide as to whether the adjustment or liquidation of the gross average is to be made by experts and liquidators appointed by themselves, in which case this shall be done should the persons interested agree.

"Should an agreement not be possible, the captain shall apply to the judge or court of competent jurisdiction, who shall be the one of the port where these proceedings are to be held in accordance with the provisions of this Code, or to the consul of Spain, should there be one, and otherwise to the local authority when they are to be held in a foreign port."

It will be seen that this towage was an accidental expense, incurred during navigation, for the preservation of vessel and cargo, within article 806 and article 811, above, and that contribution from cargo would be appropriate (article 812) unless under article 820, § 3, the injury to the vessel was caused by reason of her not being repaired, rigged, equipped, and arranged in a convenient manner for the voyage, or by reason of some erroneous order by the captain.

It is not required to decide whether the latter exception applied, if the consignees have already decided it for themselves, as they were competent to do pursuant to article 846, by mutually agreeing respecting liability liquidation and payment.

Lacking such agreement, the captain would have been required by article 851 to apply to the judge or court of competent jurisdiction for the appointment of experts.

The sections of the Code governing the proceedings of the experts, whether appointed by agreement or by the court, have not been quoted, but are in evidence. Concerning the confirmation of the conclusions of the experts, in the absence of agreement, the provision is: "Art. 865. The distribution of the gross average shall not be final until it has been agreed to, or in the absence thereof, until it has been approved by the judge or court after an examination of the liquidation and a hearing of the persons interested who may be present, or of their representatives."

The following three articles authorize collection of the amount of the distribution, by the captain; attachment of the goods when payment is not made within the third day after request; authority to the captain to defer delivery when insufficient security is given.

From the foregoing, it will appear that the consignees on October 11, 1927, could have litigated the issue of their liability for general average contribution in proceedings in court, by failing to enter into an agreement on the subject.

That the consignees knew the reason for the claim to general average contribution, appears from the terms of the agreement.

In other words, the choice on the part of the consignees, not to submit the subject to the court, was informed and deliberate. It is not too much to say that, if they had wished to reserve the question of liability, as distinguished from liquidation and payment, for decision by the court, an expression to that effect could have been embodied in the contract.

Sight has not been lost of the argument of libelant, that the form employed by these parties is not essentially different from those in use here, which quite clearly contemplate the release of cargo without prejudice to the question of liability for contribution, and the employment of a private adjuster to state the figures.

It is thought that the Spanish form must be construed in the light of the provisions of the Spanish Code, art. 846, incorporated by reference, and that, if anything less than an agreement touching liability as well as liquidation and payment had been intended, a suitable clause to that effect would have been incorporated.

It is concluded therefore, on this branch of the case, that the consignees agreed that they were liable for general average contribution, and nothing shown in the record is consistent with a different understanding upon their part, for it does not appear that recourse to the court in Barcelona was had by any of them upon the theory that they had not so contracted.

The fact that libelant is entitled to recover the difference between the 5 per cent. payment and the actual contribution found to be due, thought to be less than half of that, is not disputed, and the decree will so provide.

The basis of that right is the statement of general average, dated March 31, 1929, by Juan Gubern, the expert named in the said agreement, and, in virtue of the nature of the deposit, the consignee became entitled forthwith to the return of so much of his deposit as was then shown not to be required for his contribution.

If the computation of the latter gave credit to the depositor for interest from the date of deposit, interest would not run upon the refund, until the date of the statement; if not, he would seem to be entitled to interest on so much of his deposit as was not required for his contribution. To that right of recovery the libelant has been subrogated, which means that it is presently entitled to recover that which its insured could have had from the respondent, if he now were the party in interest, namely, a certain number of pesetas.

No reference has been made to any provision of the statutes or decisions in Spain, which gave the depositor the right to recover the excess payment, but counsel for the respondent concede such liability, and clearly it arose ex contractu on the date when the general average was stated and apportioned.

All that can be said in favor of the view that, in fairness, the libelant should be entitled to have its recovery stated in dollars, at the rate of exchange for pesetas on March 31, 1929, when the return of the excess payment became obligatory, has been stated in the dissenting opinion in the case of Deutsche Bank v. Humphrey, 272 U. S. 517, 47 S. Ct. 166, 71 L. Ed. 383.

The decision in that case, however, is squarely to the effect that, where the only liability in suit is one incurred by a corporation of a foreign country, and which the laws of that country might impose, the obligation "is not enlarged by the fact that the creditor happens to be able to catch his debtor here," and no greater obligation will be imposed than exists by the foreign law when suit is brought.

The rate of exchange, therefore, at the

date of the filing of this libel will govern the extent of the libelant's recovery.

Settle usual decree on notice, and, if this is thought to be an insufficient compliance with Admiralty Rule 46½ (28 USCA § 723), findings containing appropriate recitals as to incorporation may be settled on notice.

### Supplemental Opinion.

On settlement of the decree herein, counsel pointed out that in the judgment entered upon the decision of the case of Deutsche Bank v. Humphrey, 272 U. S. 517, 47 S. Ct. 166, 71 L. Ed. 383, the rate of exchange was fixed as of the date of judgment and not as at the moment when suit was brought as stated in the prevailing opinion, and the decree entered on the foregoing opinion will conform to the decision in that case; the respondent having been successful upon the principal point in controversy, the decree will carry costs.

The foregoing is intended to supplement the opinion heretofore filed herein.