**THE WEST ARROW.**

Nos. 197–199.

Circuit Court of Appeals, Second Circuit.
Jan. 6, 1936.

Bigham, Englar, Jones & Houston, of New York City, and Lord & Whip, of Baltimore, Md. (T. Catesby Jones, of New York City, George W. P. Whip, of Baltimore, Md., and F. Herbert Prem, of New York City, of counsel), for libelants.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J.

Zito, both of New York City, of counsel), for S. S. West Arrow and claimant and respondent American Diamond Lines, Inc.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

These cross-appeals involve liability in admiralty for cargo damage to several shipments on the West Arrow, on a voyage from Baltimore, Md., to Antwerp and Rotterdam. The ship, after undocking from her pier, headed down the Baltimore Harbor navigated by a Chesapeake Bay pilot. The tide was high-water slack, wind light, and the night clear. Her master, third officer, and a cadet were on the bridge. She had on board 3,600 tons of cargo.

When the pilot took command, Lazaretto Point bore 1½ points on her starboard bow, and she was making 4 to 6 knots under half ahead engines. The pilot ordered the helm ported, and the order was executed. As the light came ahead, the pilot ordered the helm steadied, but the ship's bow continued to swing to starboard. Her course was then 160° true, and she was about a ship's length off the pier line and about 1,500 feet from the place of her subsequent stranding. When the pilot observed the vessel's bow still swinging, he ordered the engines full ahead and the helm hard astarboard. Then, after half a minute, he ordered the engine stopped. A half minute later the engines were rung full astern and both anchors were dropped. The vessel continued ahead and stranded near the fireboat pier at Fort McHenry, heading directly for the pier at about 169° true. Her starboard anchor was immediately hove up and she was backed away from the shoal. When backed out of the channel, she came to anchor for the night. A hole was stove in her bottom under the No. 1 hold, and the water, pouring in, damaged the cargo.

It was discovered by a test made that the pilot's inability to steer was due to the telemotor. The telemotor was disconnected, and it was found that the steering gear and the trick wheel operated properly. The telemotor was then connected up to the steering engine and the wheel was turned, and it was observed that the rudder did not follow the wheel to port, although it followed it to starboard and back to amidships. The oil was drained out of the telemotor lines and other oil poured in and the telemotor operated satisfactorily.

It was found below, and satisfactorily established, that one of the proximate causes of this damage to the cargo was due to the negligence in navigation of the ship before stranding. When it was noticed that the vessel continued swinging to starboard, notwithstanding an effort was being made to steady her on her course, it was negligent navigation to order the engines full speed ahead and then the helm hard astarboard. Execution of these orders increased the swing to starboard and toward the shoal. The vessel at that time was 1,500 feet from the point of stranding. She could have anchored according to appellant's own experts, and thus avoided dangers, if her engines had been reversed. Instead, her engines were kept full speed ahead for half a minute; then stopped for half a minute; and not until then was the order full speed astern given. She stranded two minutes later. This was negligent navigation. The master of the West Arrow admitted that, if the engines had been rung immediately astern, she would have stopped before stranding.

Before the appellant can avail itself of the exemption granted by the Harter Act (Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445, 46 U.S.C.A. § 192), it must establish that it has exercised due diligence to make the ship seaworthy in all respects. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; The Wildcroft, 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794. It appears that the steering gear failed to operate properly because the telemotor failed to function as required, in operating the steering engine. This accounts for the fact that the ship swung to starboard under a port helm but would not swing to port under a starboard helm. The court below found that the cause of the failure of the telemotor to function properly was the presence of foreign matter in the telemotor oil. It was properly found below that unseaworthiness of the vessel existed, consisting in the failure to keep in position a cover, provided by the manufacturers of the telemotor, for an opening on the top of the gravity tank, which is part of the telemotor system, and in so constructing a pipe that the opening in the tank could

not be fully covered, and in using a dirty and imperfect screen as a strainer for the tank. If the instructions of the manufacturer had been followed, no foreign substance would have become commingled with the oil. The court below held that it was safe to pour oil into the telemotor system, if it was introduced by straining it through an unbroken fine mesh wire cloth strainer. The court further held that the appellant failed to keep the opening in the top of · the tank closed so as to avoid the possibility of dust or foreign matter finding its way into the gravity tank, which in turn rendered the vessel unseaworthy in respect to her steering gear.

The only inspection which the appellant attempted to prove was that of merely looking at the screen rather than removing it and examining it. It was shown that a particle as small as the eye of a small needle was sufficient to contaminate the liquid in the telemotor system so as to prevent proper functioning. The necessity for absolute cleanliness of the oil had been stressed by the manufacturer. The findings on this point have evidence to support them, and we see no occasion to disturb the conclusions reached below.

■■ But it is argued that the telemotor failed because of a latent defect, and that this was the proximate cause of the stranding. There was no latent defect. Testimony offered showed that·the manufacturer had instances reported of similar failures of the telemotor to respond, and had publicized this information. The manufacturer had given instructions as to the care and maintenance of this apparatus, and it was correctly found below that the appellant had failed to carry out these instructions. Neglecting precautions, which might have been taken if the instructions of the manufacturer had been carried out, makes the ship responsible for the resulting damage without clearer proof than was presented here that the accident was caused by a failure of performance which sprung from a latent defect. Cf. Atlantic Transport Co. v. Rosenberg Bros. & Co., 34 F.(2d)· 843 (C.C.A.9); The Vestris, 60 F.(2d) 273 (D.C.S.D.N.Y.); The Ceylon Maru, 266 F. 396 (D.C.Md.). Moreover, negligence in navigation was one of the proximate causes of the stranding as well as failure of the telemotor system. In·these circumstances, it is now authoritatively established that there need be no causal connection between the unseaworthiness and the loss. May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348.

■ The bills of lading contained clause 11, which reads:

"Notice of claim for loss, damage, or delay must be given in writing to the vessel's agent within thirty (30) days after the removal of the goods from the custody of the vessel, or, in case of failure to make delivery, within thirty (30) days after the goods should have been delivered; provided, that written notice of claim for apparent loss or damage must be given before removal of the goods. Written claim for loss, damage or delay must be filed with the vessel's agent within thirty (30) days after giving the notice herein provided for. Unless notice is given and claim filed as above provided, neither the vessel, her owner, nor agent shall be liable. No suit to recover for loss, damage, delay, or failure to make delivery shall be .maintained unless instituted within six months after the giving of written notice as herein provided."

This clause thus sets up two conditions precedent to suit: First, written notice of claim to be filed (a) where the damage is not apparent, within 30 days after the removal of the goods from the custody of the vessel, (b) where the damage is apparent, before removal of the goods, and (c) where there is a failure to make delivery within 30 days after the goods should have been delivered; second, written claim for loss, damage, or delay to be filed within 30 days after giving the notice. This provision for two notices may reasonably be required, and both must be complied with. The J. L. Luckenbach, 65 F.(2d) 570 (C.C.A.2); A. Russo & Co. v. United States, 40 F.(2d) 39 (C.C.A.5); The General G. W. Goethals. (D.C.) 298 F. 933, affirmed 298 F. 935 (C.C.A.2). And the mere fact that the carrier has knowledge of damage to the goods would not excuse failure to file the required notice of claim. T. M. Duche & Sons v. Lloyd Mediterraneo (D.C.) 31 F.(2d) 496; Anchor Line v. Jackson, 9 F.(2d) 543 (C.C.A.2); The San Guglielmo, 249 F. 588 (C.C.A.2); The Persiana, 185 F. 396 (C.C.A.2); The St. Hubert, 107 F. 727 (C.C.A.3); The Westminster, 127 F. 680 (C.C.A.3).

In the Bisbee Linseed Co. claim, the goods were linseed cakes delivered at Rotterdam and Antwerp in damaged condition. Letters were sent on December 12, 1933, to the agents of the appellant at Antwerp and Rotterdam. It is conceded these were both timely and sufficient to comply with the required notice of claim. These letters gave notice that the parties interested would hold the steamer liable for this damage, and referred to the appointment of general surveyors representing the parties who were to fix the amount of damage. Their reports are not dated within 30 days of December 12, 1933, the date of the first notice, but are dated January 13 and 24, 1934, respectively. Nevertheless, the court below found, and it is stipulated on appeal, that the surveys were made within 30 days of the receipt of the letters of claim. It was held below that the letters of December 12, 1933, combined with this survey were sufficient compliance with the second requirements that a claim be filed. These notice clauses are to be interpreted reasonably. See The J. L. Luckenbach, 65 F.(2d) 570, 574 (C.C.A.2); The Lake Gaither, 26 F.(2d) 198, 200 (C.C.A.2). The only reasonable distinction between a notice of claim and a claim is that the latter should be more definite in its language as to a demand for payment and as to the amount demanded. The letters of December 12, 1933, contained the phrases, "We have to hold you responsible for the damage," etc., and "The parties interested will hold the steamer responsible for the damage." This was definite enough as a declaration demanding payment. The amount claimed could not be supplied at the time because it was unknown. However, the amount of the damage done was ascertained shortly after these letters were sent. Since the appellant had an agent commissioned to determine the extent of the damage, and the stipulation provides that the surveys were made within 30 days of the letters of December 12, 1933, all the elements of a claim were presented to the claimant before the time limit had run. The letters of December 12th, together with the reports of the surveys, constituted a claim as well as a notice of claim. One letter may satisfy the requirements of each branch of the notice clause. The Cornelia, 15 F.(2d) 245 (D.C.S.D.N.Y.). The effect of this was to serve the required notices, and this claim was properly allowed.

The claim of the Ford Motor Company was for damages to 64 packages of automobile parts. These were part of a shipment of 276 packages. When the ship put back into Baltimore after the stranding, the damaged packages were removed from the respondent's custody on November 15th and taken to the Ford plant for reconditioning. The Ford Motor Company filed a libel against the vessel and her owners within 30 days after the goods were removed from the ship's custody, December 13, 1933. This was a sufficient compliance with both requirements of the notice clause. The Point Brava, 1 F.Supp. 366 (D.C.N.D.Cal.). This claim was properly allowed.

The claim of Dinnsen was for damage to 74 hogsheads of tobacco cargo. They were relanded at Baltimore when the ship put back to that port and sold by the appellant's agent. This appellant filed a libel against the ship November 21, 1933. A copy of this libel was sent to the Baltimore agents of the shipowners. The libel and letter were filed within the 30-day limit and were sufficient to fulfill the requirements of a notice. The Bencleuch, 10 F.(2d) 49 (C.C.A.2), is not to the contrary, for there the bill of lading was issued by the charterer and the notices were required to be given, not to the ship or its owner, but to the charterer. Sufficient notice was given to the owner in this instance by the libel and the letter. The disallowance by the court below of this claim is reversed.

The tobacco cargo of Henry Lauts & Co. was damaged and sold by the claimants' agents after the ship put back to Baltimore. On November 14, 1933, this firm wrote to the claimant, "We herewith file claim with you for loss and/or damage to our shipment and for shipments as described below. The necessary papers of the exact amount of our claim will be filed with you in due course." As pointed out in the discussion of the Bisbee claim, the only reasonable distinction between a notice of claim and a claim seems to be in the latter's greater definiteness. This letter lacks definiteness of claim, and thus fails as a compliance with the bill of lading requirements. The court below properly disallowed the claim, and that decision is affirmed. If

there had been a conversion by the shipowner, the bill of lading provisions as to notice would not have to be filed before suit, and the last two claims could be allowed on that ground. However, the court below found, and we agree, that the salvage sales were not conversion. There is no basis for finding that this sale was an unauthorized violation of the shipper's rights.

The damages awarded in the Bisbee Company and Muir Company claims were stipulated in guilders. The breach was in Rotterdam or Antwerp, and the rule is that, where a sum of money is payable in a foreign country, and a suit to compel payment is instituted in this country, a recovery, the amount of which is stated in the currency of a foreign country, must be converted into dollars at the rate of exchange prevailing at the date of the court's decree. Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383. The court properly applied the rule here.

The vessel owner required contribution in general average from the cargo owners. Under the Jason clause in the bill of lading, the consignees agreed that, if the vessel owner has used due diligence to make the ship seaworthy, the cargo may be held liable in general average when the sacrifices and expenses are made necessary by a casualty resulting from negligent operation. It was properly held below that the West Arrow was unseaworthy when she sailed on her voyage and that there had been a failure to exercise due diligence to make her seaworthy. Under these circumstances, the respondent was not entitled to contribution in general average. However, it collected cash deposits in respect of some of the appellant's shipments and retained the same. These libelants were wrongfully deprived of the use of their money. They are entitled to the return of the deposits, plus 6 per cent. interest from the date they were collected. Respondent argues that it is liable only for the interest actually earned, and that, since no interest was earned, its obligation is merely to return the original deposits. Damages in admiralty are not decreed to punish but to make a libelant whole, and the doctrine applicable is restitutio in integrum. See The Baltimore, 8 Wall. 377, 385, 19 L.Ed. 463. The appellant is not a trustee by virtue of the contract between the parties, providing for the creation of a trust, as was the situation in the authorities cited by it, but its status is merely one which is forced on its conscience by equitable construction and operation of law. The rule with relation to a trustee's liability for interest which the appellant invokes for its benefit has been applied in cases where the trustees were acting under an express trust. But for the Jason clause, the respondent would have had no right to collect general average deposits. The condition of the applicability of the Jason clause is that the shipowner has exercised due diligence, a fact peculiarly within its own knowledge. The collection of the deposits was wrongful due to the ship owner's breach of duty. It was a constructive trustee, and now, when restitution must be made, the court, proceeding upon equitable principles (see Isla De Panay, 267 U.S. 260, 275, 45 S.Ct. 269, 69 L.Ed. 603; Higgins v. Anglo-Algerian S. S. Co. [C.C.A.] 248 F. 386, 389), may compensate those losing the use of their money by allowing interest during the time it was withheld. Cash deposits wrongfully exacted by a vessel when returned by court decree have borne interest. The Energia, 61 F. 222 (D.C.S.D.N.Y.), affirmed (C.C.A.) 66 F. 604. Interest will therefore be allowed in each instance.

The decree will be modified in accordance with this opinion.