**In re GOOD HOPE CHEMICAL CORP., Debtor.**

**Bankruptcy No. 75–2742–G.**

United States Bankruptcy Court, D. Massachusetts.

July 22, 1983.

Steven Gordon, McCabe/Gordon, P.C., Boston, Mass., for debtor.

Charles Normandin, Ropes & Gray, Boston, Mass., for Koerver & Lersch.

C. Hall Swaim, Hale & Dorr, Boston, Mass., for Creditors' Committee.

MEMORANDUM AND ORDER

RE: EXCHANGE RATE ISSUE

PAUL W. GLENNON, Bankruptcy Judge.

On June 12, 1980, Koerver & Lersch, a German corporation, Good Hope Chemical Corporation, a Chapter XI debtor, and the creditors' committee of Good Hope Chemical Corporation entered into a stipulation (approved by the Court) fixing the amount of Koerver & Lersch's claim in the United States dollar equivalent of 11,055.121 Deutsche marks. The stipulation expressly left open the question as to what date the amount of the claim should be converted into United States dollars. That question, which was briefed and argued by counsel on January 20, 1983, is addressed by this memorandum and order.

FACTS

Koerver & Lersch ("K & L") and Good Hope Chemical Corporation ("Chemical") contracted in 1974 for K & L to construct two sets of heat exchangers intended for use in an ammonia plant to be constructed by Chemical in Ingleside, Texas. The M.W.

Kellogg Co., a division of Pullman Incorporated ("Kellogg"), acted as Chemical's purchasing agent. Through a series of telexes, the contract was formed. The first relevant telex was dated July 12, 1974 and was sent from Kellogg to K & L. The price of the heat exchangers was stated in United States dollars. Two weeks later, on July 25, 1974, K & L sent a telex to Kellogg which stated "all prices in the purchase order to be in german marks as follows .... two plants have been ordered at a total price of 13.046.540,—german marks. [I]f the purchase order is made out in dollars, it will not be accepted .... [T]he dollar prices shown in your purchase order have been worked out at a rate of one german mark equal to 0,394 dollars and have been used for comparison reason only."

Chemical purchase orders dated October 3, 1974 list the price of each of the heat exchangers in United States dollars and provide further that: "[p]ayment will be made by Good Hope Chemical Company in U.S. Dollars equivalent to the following German Marks ...." and set forth the amounts in German marks.[1] Subsequent modifications to the purchase order by Chemical reflect price increases were to be paid "[i]n accordance with terms of original purchase order, payment is to be made in U.S. dollars equivalent to German marks indicated. U.S. dollar amount shown is based on rate of one German mark equal to 0.394 dollars as per original order." "U.S. dollar amount shown is approximate and for MWK [Kellogg] purposes only ...." Invoices sent from K & L to Chemical and dated October 17, 1974 and January 21, 1975, list the amount due K & L in German marks. Payment was to be made 30 percent 90 days after placement of the order, 30 percent 180 days after placement of the order and the balance of 40 percent on shipment FOB, North Sea Port.

Although the first two invoices were sent to Chemical,[2] no payment was ever made. At the hearing held on January 20, 1983, Hans Dreyer, the employee of K & L responsible for negotiating the contract with Chemical, testified that K & L was willing to accept payment only in United States dollars equivalent to a fixed number of German marks. That would enable K & L to pay its employees and suppliers the amount of money (i.e. German marks) it actually expended in constructing the heat exchangers. All employees and suppliers were paid in German marks. All of K & L's offices were in Germany. K & L had no investments outside of Germany. K & L was unwilling to shoulder the risk of foreign exchange fluctuations.

Payment was to be made by Chemical through its bank to a German bank. Chemical was to inform its bank of how many German marks it owed K & L. The American bank would then correspond with a German bank and set a date for exchange. On this date, the American bank would wire marks to the German bank, the German bank would credit K & L's account with that amount of German marks and Chemical's account in the American bank would be debited in an equivalent amount of United States dollars. Only on that date would Chemical learn the cost in United States dollars, of the heat exchangers, to that date.

Construction of the heat exchangers was suspended in July of 1975 due to the severe financial difficulties being experienced by

---

1. It appears the contract was formed on this date as the July 25, 1974 telex from K & L to Chemical was a counteroffer which required acceptance by Chemical, *see generally* 1 Corbin on Contracts (1963), which was accepted by the October 3, 1974 purchase order. Furthermore, the above-mentioned stipulation provides, "on or about October 3, 1974, Koerver & Lersch contracted with the M.W. Kellogg Company ...". However, the October 3, 1974 purchase order states: "[t]his is a confirming order. Telex advice to proceed was given to your Mr. H.H. Dreyer on July 12, 1974." Additionally, the July 25, 1974 telex provides: "We ... are proceeding with the execution of your order." Although I recognize that there is some confusion as to the date the contract was formed, I believe I can get my job done without deciding that issue.

2. The first bill requested payment on October 12, 1974 which clearly would not be 90 days after the contract was formed if October 3, 1974 is the operative date. It instead represents 90 days from the date of Kellogg's first telex. *See supra* note 1.

Chemical. Chemical filed its Chapter XI petition on October 3, 1975. On June 21, 1977 the creditors' committee of Chemical filed a motion requesting the Court to order the debtor to file its statement of executory contracts [3] and requesting an order that all contracts relating to the ammonia plant be deemed rejected. As grounds therefore, the committee alleged *inter alia* that it was unlikely that the contracts relating to the construction of the ammonia plant could be assumed by Chemical and the ammonia plant completed. Chemical objected to the motion on the grounds *inter alia* that the creditors' committee was not the proper party to move for a "wholesale" rejection of all executory contracts, that each contract should be examined individually to determine whether its rejection would benefit the debtor's estate, and that the Court could not order rejection of the executory contracts but could only set a date within which the debtor must assume or reject the contracts. By memorandum and order dated June 8, 1978, the Court denied the creditors' committee's motion on the grounds that there was no showing that the contracts were burdensome to the estate and no showing that rejection would benefit the creditors.

At some later point in time, Petroleos Mexicanos ("Pemex"), the Mexican National Oil Company, desired to purchase the two heat exchangers. Chemical filed a complaint against K & L and Pemex seeking to enjoin the sale of the heat exchangers to Pemex. By order dated September 12, 1978, the Court denied the injunctive relief requested (with certain limitations not relevant here) and allowed the sale to proceed. In addition to the request for injunctive relief, the complaint contained an objection by Chemical to the proof of claim filed by K & L and requested *inter alia* that the Court disallow the claim.[4] The above-mentioned stipulation was entered into on June 12,

1980 by Chemical, K & L, and Chemical's creditors' committee in settlement of the dispute as to the amount of the total claim of K & L. The Court approved the stipulation on that date.

Concerned with the exchange rate issue is the creditors' committee, rather than the debtor. This is because the plan of Chemical, confirmed on May 9, 1980, is a "pot plan" so that my decision affects the amount other creditors of Chemical will receive and does not require Chemical to supply additional money to fund the plan. In determining what date the DM 11,055.121 is to be converted into United States dollars, K & L argues that the Court should apply the "judgment day" rule, i.e., either the date on which the stipulation was approved by order of the Court or the date on which the plan of arrangement was confirmed which plan provided for the rejection of all executory contracts. On the former date, the exchange rate was 0.5679, producing an award to K & L of $6,278,203; on the latter date the exchange rate was .05529 and would produce $6,112,376. The creditors' committee contends that the "breach day" rule should apply, i.e., the date of the filing of the Chapter XI petition. The conversion rate of .3913 in effect then would produce $4,325,869. For the reasons set forth below, I am applying the judgment day rule to compute the claim of K & L. In so doing, the rate of exchange in effect on June 12, 1980, i.e., 0.5679 applies.

## DISCUSSION

Initially, it must be mentioned that neither party believes there is a conflict as to the applicable law. Both parties proceed on the assumption that the applicable law is that as set forth by the federal courts of the United States, and I have no reason to reject that choice of law.[5]

Two Supreme Court cases, *Hicks v. Guinness,* 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168

---

**3.** No statement of executory contracts, as required by Bankruptcy Rule 11–11, had been filed by Chemical.

**4.** There were two proofs of claims filed by K & L to reflect that two heat exchangers were under construction. The DM 11,055.121 agreed upon by the parties reflects the total amount

due K & L less the proceeds realized from the sale to Pemex.

**5.** Although I recognize that an argument can be made to the contrary, *see* Restatement (Second) Conflict of Laws § 188 (1971), K & L raised this point in its memorandum and summarily dismissed it on the basis that even if the

(1925) ("*Hicks*") and *Deutsche Bank v. Humphrey,* 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926) ("*Humphrey*") control the issue at hand. In the *Hicks* case, a German firm owed a pre-World War I debt to an American firm. The debt was payable in the United States although expressed in German marks. Justice Holmes stated: "[T]he debt was due to an American creditor and was to be paid in the United States. When the contract was broken by a failure to pay, the American firm had a claim here, not for the debt, but, at its option, for damages in dollars. It no longer could be compelled to accept marks. It had a right to say to the debtors 'You are too late to perform what you have promised, and we want the dollars to which we have a right by the law here in force. . . .' " *Hicks, supra* 269 U.S. at 80, 46 S.Ct. at 47.

The next year, in the *Humphrey* case, the Supreme Court again addressed the issue of the proper date for conversion. In that case, an American citizen brought suit in the United States to recover money deposited in a German bank in Germany, payable in marks on demand. Justice Holmes, again writing for the Court, stated:

> A suit in this country is based upon an obligation existing under the foreign law at the time when the suit is brought, and the obligation is not enlarged by the fact

that the creditor happens to be able to catch his debtor here. . . . We may assume that when the [debtor] failed to pay on demand its liability was fixed at a certain number of marks both by the terms of the contract and by the German law—but we also assume that it was fixed in marks only, not at the extrinsic value that those marks then had in commodities or in the currency of another country . . . . [The liability] was and continued to be a liability in marks alone and was open to satisfaction by the payment of that number of marks, at any time . . . . An obligation in terms of the currency of a country takes the risk of currency fluctuations and *whether creditor or debtor profits by the change the law takes no account of it. Humphrey, supra* at 519, 47 S.Ct. at 166–167 (citations omitted) (emphasis supplied).

■ These two cases have been reconciled by interpreting them to stand for the proposition that the judgment day rule applies where the obligation is entirely of foreign origin, i.e., where the contract calls for payment of a foreign currency in a foreign country (*Humphrey* and Restatement (Second) Conflict of Laws § 144 (1971)) while the breach day rule applies where payment is to be made in the United States (*Hicks*).[6] The problem arises be-

---

law of a different jurisdiction applies, there is no conflict. It appears K & L is correct.

**6.** There are a number of cases which appear to rely (at least in part) on this distinction. *See, e.g., Zimmerman v. Sutherland,* 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927); *Sutherland v. Mayer,* 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943 (1926); *Jamaica Nutrition Holdings, Ltd. v. United Shipping Co.,* 643 F.2d 376 (5th Cir. 1981); *Wyse v. Pioneer-Cafeteria Feeds, Ltd.,* 340 F.2d 719 (6th Cir.1965); *Conte v. Flota Mercante Del Estado,* 277 F.2d 664 (2d Cir. 1960); *Reissner v. Rogers,* 276 F.2d 506 (D.C. Cir.), *cert. denied,* 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960); *International Silk Guild v. Rogers,* 262 F.2d 219 (D.C.Cir.1958); *The Gylfe v. The Trujillo,* 209 F.2d 386 (2d Cir.1954); *Paris v. Central Chiclera,* 193 F.2d 960 (5th Cir.1952); *Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg,* 189 F.2d 952 (2d Cir.1951); *The West Arrow,* 80 F.2d 853 (2d Cir.1936); *Tillman v. Russo Asiatic Bank,* 51 F.2d 1023 (2d Cir.1931), *cert. denied,* 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932 (1932); *Brown & Williamson Tobacco Corp. v. The Anghyra,* 198 F.Supp. 321

(E.D.Va.1961); *Sun Insurance Office, Ltd. v. Arauca Fund,* 84 F.Supp. 516 (S.D.Fla.1948); and *Royal Insurance Co. v. Compania Transatlantic Espanola,* 57 F.2d 288 (E.D.N.Y.1932). *See also* Beale, 2 Conflict of Laws §§ 423.1–424.2 (1935); Drake, *The Proper Rule in Fluctuating Exchanges,* 28 Mich.L.Rev. 229 (1930); Fraenkel, *Foreign Moneys in Domestic Courts,* 35 Colum.L.Rev. 360 (1935); Gluck, *The Rate of Exchange in The Law of Damages,* 22 Colum.L.Rev. 217 (1922); Rifkind, *Money as a Device for Measuring Value,* 26 Colum.L.Rev. 559 (1926); Note, *Conversion Date of Foreign Money Obligations,* 65 Colum.L.Rev. 490 (1965); Note, *The Value of Foreign Money for Purposes of Suit in the Forum and as of What Time It Should be Ascertained,* 26 Colum.L. Rev. 209 (1926); Note, *Fluctuating Rates of Exchange and the Conflict of Laws,* 40 Harv.L. Rev. 619 (1927); Note, *The Measurement of Foreign Money Obligations,* 36 Va.L.Rev. 215 (1950); and Note, *Dollar Damage Awards to Foreign Plaintiffs,* 61 Yale L.J. 758 (1952).

cause an American court cannot enter judgment in any currency other than that of United States dollars. *See Frontera Transportation Co. v. Abaunza,* 271 F. 199 (5th Cir.1921). This rule is so well entrenched in American law that it is not open to exceptions and requires no further citations to authorities.

Proponents of the judgment day rule have recognized its advantage of promoting uniformity no matter where suit is brought. Conversely, it has been criticized because it may tempt a party to breach a contract which calls for payment in a depreciating currency. Furthermore, damages may not be expeditiously determined by a court burdened with a heavy calendar, i.e., a long delay in bringing a case to trial conceivably could affect the amount of the judgment ultimately obtained. This is because the debt becomes the judgment only at the time the court enters judgment.

On the other hand, the breach day rule is justified on the theory that foreign money is considered a commodity the value of which tends to fluctuate. Under that analogy, damages for failure to deliver the foreign currency are to be assessed as would be damages for failure to deliver any commodity contracted for, i.e., as of the date the contract was broken without regard to fluctuating exchange rates. This rule attempts to place the plaintiff in the position it would have been in had the contract been fully performed. However, it is obvious that this rule enables a plaintiff (assuming no jurisdictional problems) to shop for the most favorable forum (i.e., the forum where the value of its money has appreciated) to obtain the largest judgment. Furthermore, it potentially can work a substantial harm or provide a substantial windfall to the creditor who intends to retain the foreign currency for which it contracted (depending upon whether there has been an appreciation or depreciation in the foreign currency

between the two relevant dates). Most importantly, it is recognized that the arguments stated above may be proffered by either party depending upon the circumstances of a particular case.[7]

In the instant case, K & L contracted with Chemical to be paid a fixed number of German marks. K & L needed a certain number of marks to pay its suppliers and employees and was expecting this number from Chemical. It is clear, by the very words of the July 25, 1974 telex, that K & L was unwilling to bear the risk of currency fluctuations. The purchase orders of Chemical acknowledged the intent of K & L by setting forth the total number of marks to be paid K & L in the United States dollars equivalent of a fixed number of German marks. A quick reading may suggest that payment was to have been made in dollars rather than marks. However, a careful reading makes it clear that the number of marks to be paid was the constant. It was only the number of dollars which was subject to fluctuation. At all times K & L expected (and bargained for) a definite number of marks. *Cf. Booth & Co. v. Canadian Government Merchant Marine,* 63 F.2d 240 (2d Cir.1933). It was Chemical which could not be certain of its obligation until payment was remitted. It is unlikely that Chemical possessed the large number of German marks necessary to complete the performance called for under the contract. It would be necessary for Chemical to buy marks with the only currency it had readily available, i.e., with United States dollars.[8] K & L would always receive marks, in Germany, as a result of the exchange transaction described above.

Of course, one of the problems faced by the Court is that it is not *Chemical* who asserts the transaction was not a German transaction, but rather the *creditors* of Chemical whose pocketbooks have already

---

7. *See Fraenkel, supra* note 6; Note, *Conversion Date Of Foreign Money Obligations, supra* note 6; Note, *The Value of Foreign Money, supra* note 6; Note, *Fluctuating Rates of Exchange, supra* note 6; Note, *The Measurement of Foreign Money Obligations, supra* note 6; and Note, *Dollar Damage Awards, supra* note 6.

8. If Chemical wished to protect *itself* against a decline in the purchasing power of the dollar, it could have done so, e.g., by purchasing futures contracts or obtaining letters of credit.

been hit hard due to the filing of the Chapter XI petition, i.e., the delay in receiving a final dividend, and the compromise of their claims. It is well recognized that one of the foremost goals of bankruptcy administration is equal treatment of creditors. "[T]he theme of Bankruptcy Act is equality of distribution." *Sampsell v. Imperial Paper & Color Co.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 *reh'g denied,* 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941) and *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946) ("*Vanston*"). The Chemical creditors' committee argues that to convert the claim of K & L on any date other than the date of the filing of the Chapter XI petition would fly in the face of *Vanston* wherein the Supreme Court refused to allow accrued interest to be paid on unsecured claims because of the belief that to do so would be tantamount to imposing a penalty upon the debtor's obligations due to the inherent delays of bankruptcy proceedings.

I find the relief requested in that case differs from that requested by K & L here. K & L is not seeking to obtain for itself a position better than all other similarly situated creditors; it is not seeking to penalize the debtor. Rather, it, like all other creditors, is seeking to have its claim fixed. Once fixed, it, like all other similarly situated creditors, will receive a pro rata dividend pursuant to the plan of arrangement confirmed by order of the Court on May 9, 1980. It is not relevant that, if K & L converts the dollars it receives as a dividend into German marks, the percentage of marks it receives to its total claim in marks may be greater than the percentage received by American creditors who receive

and *retain* United States dollars. For each creditor the Court looks to the bargained for terms of its contract. *See, e.g., United Merchants and Manufacturers, Inc. v. Equitable Life Assurance Society,* 674 F.2d 134 (2d Cir.1982).

Having found the judgment day to be the applicable day for converting marks to dollars, it is left for me to determine which of the two dates proffered by K & L is the judgment day. I find the judgment day to be the date the stipulation was entered into and approved by the Court, i.e., June 12, 1980. It cannot be the date the plan was confirmed (May 9, 1980) because of § 63c of the Bankruptcy Act. That section provides: "Notwithstanding any State law to the contrary, the rejection of an executory contract ... shall constitute a breach of such contract ... as of the date of the filing of the [Chapter XI] petition." As set forth in 3A Collier on Bankruptcy ¶ 63.35 at 1956.1 (14th ed. 1975), "[t]he effect of the rejection as a breach relates back to the date of the filing of the petition in bankruptcy or of the original petition under chapter X, XI, XII, or XIII of the Act" (footnote omitted). "While this is a fictional relation back, it is necessary as a mechanical device." S.Rep. No. 1916, 75th Cong.3d Sess. 6 (1938).[9] Therefore, were the Court to accept K & L's suggestion of May 9, 1980 as the judgment day, it would relate back to October 31, 1975, the date of the filing of the Chapter XI petition, i.e., the breach day and thereby defeat the argument of K & L.

I believe June 12, 1980 to be the proper judgment day. It was not until that date that the claim was fixed (albeit in German marks). Upon entering into the stipulation,

---

9. The proposed wording of that section was: "rejection of an executory contract as provided in this act shall constitute an anticipatory breach, in the case of an arrangement or a plan, as of the date of rejection, otherwise as of the date of bankruptcy." *See* 83 Cong.Rec. S8687 (daily ed. June 10, 1938). The Senate committee stated it was "in accord with the objective of [the proposed] provision [but deemed] it inadvisable to make a distinction in regard to the date of the breach, between a strict bankruptcy and a debtor relief proceeding. Therefore [the] committee ... removed this distinction and ... related the time of the breach to

the date of the filing of the petition under the act." S.Rep. No. 1916, *supra.* The case of *U.S. Metal Products Co. v. United States,* 302 F.Supp. 1263 (E.D.N.Y.1969) cited by K & L in support of its argument that the breach day is the day the plan was confirmed, instead stands for the proposition that the filing of a Chapter XI petition, unlike a straight bankruptcy petition, does not automatically constitute an anticipatory rejection of all executory contracts. Therefore, the date of confirmation may only relate back to the breach day (the date of the filing of the petition) and may not be the judgment day.

the parties agreed to "fix and liquidate" the claim of K & L, i.e., the parties agreed that judgment could enter as to the claim of K & L on that date. As stated in *Humphrey* 272 U.S. at 520, 47 S.Ct. at 167, "we are lending our Courts to enforce an obligation (as we should put it, to pay damages,) arising from German law alone and ought to enforce no greater [nor lesser] obligation than exists by that law at the moment when the suit is brought." Accordingly, the DM 11,055.121 are to be converted into United States dollars at the exchange rate prevailing on June 12, 1980.

SO ORDERED.