JOSHUA PARKER, Respondent, *v.* OLGA I. HOPPE, Appellant.

(Submitted January 4, 1932; decided February 9, 1932.)

*Harris Jay Griston* and *Philip Krimko* for motion.

*Vermont Hatch* and *Thomas Kiernan* opposed.

CRANE, J. The very full and thorough brief submitted by the respondent on his motion for a reargument requires a further word from us, in view of the many authorities cited, and the apparent misunderstanding of their application, and the purport of our decision. We in this case have been talking about rubles as the money and circulating medium of the country which at all times, so far

as appears from the record in this case, retained its nature as rubles, although depreciating in purchasing and exchange value. The court is solely interested in translating these rubles into dollars, according to the value in our money of the Russian ruble at the time when the plaintiff was entitled to receive them — when they were due to him in Russia.

As stated in the main opinion, the purchase and sale was a Russian contract to be performed in Russia by subjects of that country. The plaintiff rescinded the contract and was entitled to receive back from the defendant the 100,000 rubles paid as the purchase price. Suppose that instead of going to court, the defendant, upon the plaintiff's demand, had paid back the 100,000 rubles. They would have been received in Russia in the money of that country. No account would have been taken of depreciation. If upon receiving them the plaintiff had immediately brought his rubles to New York, he could only have gotten for them their value in our money at that time. No one here would have given him their value as it was the year before. Why should the courts adopt a different valuation because repayment by the defendant has been forced instead of being voluntary? Now that is this case. The plaintiff rescinds and wants his money back; the court gives him his money as of the day he is entitled to it, and the New York courts translate its value into United States money as of that day.

The recent monetary change which has come in the value of the pound sterling may be taken as an illustration. Assume that a contract was made in England between Englishmen, to be performed there, for the purchase and sale of goods. The price is paid when the pound sterling has a fixed and stable value. After the abandonment of the gold standard and the fall in the value of the pound, the purchaser rescinds his contract and wants his money back. What would the seller and the courts give him?

He would receive the same number of pounds which he had paid, irrespective of their purchasing or exchange value. No court in England would entertain for a moment an inquiry as to the difference in value of the pound between the time of payment and the time of the return. Yet the difference in the exchange value in this country would be almost a dollar and a half to the pound. Such an one suing in rescission in our courts would receive in United States money the value of the pounds as of the time he was entitled to them, and not as of the time he had paid them to the seller. The parties to this contract were dealing with money as money. Had property of any other nature been given to the seller, on rescission he would have been obliged to return the identical property or replace it in value as of the time received less natural deterioration, cost of keep and like deductions. (*Cox* v. *Stokes*, 156 N. Y. 491, 507; 3 Black on Rescission and Cancellation, § 690; Woodward on Quasi-Contracts, §§ 260–268; Keener on Quasi-Contracts, pp. 300 to 302.)

This is the law as we find it running through the cases now cited for the first time by the respondent. (*Pilkington* v. *Commissioners for Claims on France*, [1821] 12 Eng. Rep., Full Reprint, Privy Council, book 1, p. 381; or II Knapp, 7.) In this case money had been confiscated by France during the period of the Revolution. A debtor to an English firm was obliged to pay the money to the French government or else refrain from paying it to his English creditor. Later, by treaty of Paris, March, 1814, commissioners were appointed of the two contracting powers to examine the claim of subjects against the French government for the value of their goods, tangible or intangible, confiscated by the French authorities, up to the amount of their loss. A question arose over the depreciation in value of assignats, from the passing of the confiscation decree to the repeal of it. The Privy Council decided that the French government

should pay the value of assignats at the time of confiscation, or, in other words, should stand the loss through depreciation in money value. The debt was due when confiscated. At this date the money was due the creditor in England, and the debtor failed to pay it because of the French decree. The loss was due to the wrong of the French government in confiscating the debt. Such also was the ruling in " *Celia* " (*Owners*) v. " *Volturno* " (*Owners*) (L. J. [1921] Rep. New Series, 90 Priv. Council, p. 385).

Counsel refers to the numerous cases dealing with Confederate money, arising shortly after the Civil War. The principle in all of these is, that the Federal government recognizes the validity of the contract, and that the purchases made, for which notes or bonds were given, payable in Confederate money, are valid in the manner in which the parties intended them to be valid, *i. e.*, the price was intended to be the value of the Confederate money at the time of the contract. The Confederate money was not recognized by the Federal government as legal at any time. It considered it as of no value. For the purpose, however, of establishing the intent of the parties, the court determined that the seller could recover from the purchaser a sum, in Federal money, equalling the value which the parties had in mind at the time of the contract. This is clearly expressed in the following words of Mr. Justice FIELD, in *Effinger* v. *Kenney* (115 U. S. 566, p. 575): " Where a contract is for the delivery of specific articles, the rule undoubtedly is that the damages recoverable for its breach are to be determined by the value of the articles at the time and place of their delivery. Where a contract is payable in a specified currency, the rule is also clear that such currency is demandable and receivable at the maturity of the contract, whatever change in its value by increase or depreciation may have taken place in the meantime. The damages recoverable for a breach of the contract are to

be measured by the value of the currency at its maturity. But in these rules it is assumed that the articles to be delivered are lawful property, and that the currency to be paid is a lawful currency, and that, therefore, in the creation and exchange of both no public duty is violated. The treasury notes of the Confederate States constituted, under the laws of the United States, neither lawful property nor lawful currency. They were the promises of an insurgent and revolutionary organization, payable only when its success should be established by a treaty of peace with the United States. Of the value of such promises the National courts will make no inquiry, except as they were receivable in contracts not designed to further the insurrection. They were receivable in such contracts because imposed as a currency upon the community by irresistible force. Their intrinsic value was nothing, but their exchangeable value, by reason of their enforced circulation, was the estimate of them at the time in lawful money of the United States. The relation between them and coin and other lawful money was well known in the community, as it was only with coin or other lawful money as a standard of value that commerce was conducted between the insurgents and persons outside of the Confederacy. Persons then parting with lands and goods for Confederate notes, or for the promise of them, attached to them this exchangeable value, and expected to receive it then or afterwards. They did not intend to surrender, or suppose they were surrendering, their property without any consideration, if the Confederacy should fail, and its notes lose this exchangeable value. They expected an equivalent in any event. Therefore, as having the value thus given to them at the time and place of their receipt, or the promise of them, the National courts will treat them, but not as having a value at any other time or place. Any other rule would involve considerations of inextricable difficulty,

and would be inconsistent with justice in determining the value of contracts thus payable, where they matured near the close or after the overthrow of the Confederacy."

The rubles in this case always remained during the times in question, the money of Russia, under its different forms of government. So far as the record here shows, the ruble did not change its nature as money, nor was it debased in its intrinsic value. If a country creates a new monetary system, or by law debases its coinage by increasing the alloy, a different situation would arise. We have no such question before us in this case. (*Pilkington* v. *Commissioners for Claims, supra,* pp. 385, 386.)

In our former opinion we did not decide the actual date at which the exchange was to be figured; we did decide, for reasons there stated, that it was not the date of payment under the contract or the date of the contract. This was the only question presented and argued. The case came up on a motion for judgment on the pleadings and affidavits; there had been no trial. We felt that as long as other questions had not been argued or presented we had best reserve them for later determination. We have not changed our opinion in this particular, although we are now requested by the respondent to determine the day of breach as of the time when the defendant sold the wax in England. What was the exact date of rescission and whether value should be fixed as of the time of the breach or the time of the rescission, if these be different dates, we leave for consideration on the facts as established and after a full and timely presentation.

With these further comments upon the case, and the reasons for our decision, we deny the application for reargument.

CARDOZO, Ch. J., POUND, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Motion denied.