**BOOTH & CO., Inc., v. CANADIAN GOVERN-MENT MERCHANT MARINE, Limited, et al.**

No. 229.

Circuit Court of Appeals, Second Circuit.

Feb. 14, 1933.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (L. de Grove Potter and Joseph Whelan, both of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight, Jr., and Herbert K. Stockton, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The question presented by this appeal involves the interpretation of the provisions of a bill of lading with respect to the payment of freight on goods consigned to the libelant and carried from New Zealand to New York on the respondent's vessel. The vital clause reads as follows:

"Freight for the said goods to be paid in cash ———— at the rate of Eighty-five shillings (85/—) per ton ———— payable in Port of ~~Shipment~~ Delivery, in British sterling or equivalent, rate of exchange to be calculated on current rate at date of steamer's arrival at loading Port."

The word "shipment" was stricken out, as indicated. In the lower left-hand corner of the bill of lading was a printed marginal provision: "Freight, if payable at Destination to be at the rate of $——— Exchange." Across this was stamped "Freight Payable Destination."

When the vessel arrived at her loading port (Lyttleton, New Zealand), British sterling was quoted at $4.85 to the pound; when she reached the port of delivery (New York), the rate of exchange had fallen to $3.75. The libelant tendered £23.16.10 as payment of the freight, but the respondent refused the tender, demanding payment of an equivalent sum in dollars at the rate of $4.85 to the pound. To this demand the libelant acceded in order to obtain delivery of its goods, but the payment was made and received without prejudice to the libelant's legal rights. This suit followed. The respondent's answer admitted the facts alleged in the libel and denied only the conclusion that the freight had been overpaid. Upon exceptions, the answer was stricken out and a decree awarded the libelant. Although the sum here involved is insignificant, being only $26.22, the briefs state that this is a test case upon which claims in a substantial amount are to be determined.

The questions in dispute are whether the libelant was given an option to pay in sterling or in dollars, and, if it was, whether the amount of sterling must equal in value the dollars which would have been paid had the libelant elected to pay in dollars.

We cannot doubt that an option was given. Freight was to be calculated at the rate of 85 shillings per ton (which came to £23.16.10) and was payable in "British sterling or equivalent." If this were all, the "equivalent" to £23.16.10 would be currency of equal value and would include dollars figured at the current rate of exchange when

payment became due; that is, $3.75. See Paup v. Drew, 10 How. 218, 223, 13 L. Ed. 394. But the contract of the parties went further and provided how the "equivalent" should be calculated, namely, "on current rate at date of steamer's arrival at loading Port." This rate was $4.85; it fixes the number of dollars to be paid, if payment is made in dollars. It does not, however, negative the existence of an option; the contract is to pay in the alternative "sterling or equivalent," the latter to be determined at the stipulated rate. Had the parties intended to require payment in dollars only, the means were at hand; they had merely to fill in the marginal provision above quoted. Had this been done, the duty to pay in dollars at the fixed rate would have had no alternative. Pennsylvania R. Co. v. Cameron, 280 Pa. 458, 124 A. 638, 33 A. L. R. 1281; see also Marine Ins. Co. v. McLanahan, 290 F. 685 (C. C. A. 4); Howard, Houlder & Partners v. Union Marine Ins. Co., 38 Times L. Rep. 515. But it was not done.

The appellant is therefore forced to argue that, even though the libelant had the alternative of paying in pounds or in dollars, it must pay sufficient pounds at their depreciated value to equal the dollars payable had it elected to pay in dollars. This would require the delivery of more pounds than the words "payable in British sterling," "freight to be paid in cash ——— at the rate of 85 shillings per ton," will justify. The duty to pay in pounds would be satisfied by the payment of the agreed number of pounds, regardless of their depreciation in the currency of other countries. Deutsche Bank v. Humphrey, 272 U. S. 517, 47 S. Ct. 166, 71 L. Ed. 383; Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; Société des Hôtels, etc., v. Cummings, L. R. (1922) 1 K. B. 451. It is argued that the parties cannot have contemplated that the shipowner should get less, if sterling were the medium of payment rather than dollars; and very likely this is true. When the contract was entered into, Great Britain had not abandoned the gold standard, and the parties most probably believed that sterling would not suffer any depreciation in the rate of exchange. Had the shipowner anticipated it, it would certainly have stipulated for payment in dollars. But there may be a difference between the expectations of the parties to a contract and the duties it imposes. Legal Tender Cases, 12 Wall. 457, 548, 20 L. Ed. 287. The question is really which party assumed the risk of fluctuation in the rate of exchange. The carrier was a Canadian company, sailing from another British possession and using a

bill of lading which contemplated sterling as the primary medium of payment. It gave the shipper an option to pay an "equivalent," and, by fixing the rate of exchange on a day certain, relieved him of the risk of dollars depreciating during the voyage; but we see nothing to indicate that the carrier was not to bear the risk of depreciation in sterling. To hold the contrary would make the dollar the primary medium of payment, which it clearly was not.

Decree affirmed.