**SHAW, SAVILL, ALBION & CO., LTD. v.
The FREDERICKSBURG.
The TAMAROA.**

No. 239, Docket 21974.

United States Court of Appeals
Second Circuit.

Argued April 9, 1951.
Decided May 28, 1951.

On January 27, 1944, a collision occurred in British territorial waters between the

British steamer Tamaroa, owned by libellant, a British corporation having its office and place of business in London, England, and the American vessel Fredericksburg, owned by claimant. Libellant filed its libel on March 12, 1945, in the court below. After claimant filed its answer, the issues relating to fault were settled by an agreement dated April 6, 1948, whereby claimant, owner of the Fredericksburg, agreed to bear her damages and pay seventy-five percent of the Tamaroa's provable damages with interest. On March 7, 1949, claimant, in order to stop further accrual of interest, made a partial payment to libellant, on account, of $100,000. On September 18, 1949, Sir Stafford Cripps, British Chancellor of the Exchequer, announced that the English pound would be devalued by approximately thirty percent in relation to the American dollar. Thereafter the rate at which Sterling could lawfully be exchanged for dollars fell by that amount. On May 12, 1950, the Tamaroa's damages were stipulated by an agreement leaving for determination by the Court the rate of exchange to apply in calculating the sum to be made payable by final decree. Parts of the stipulation are set forth in the Appendix hereto.

The principal item in dispute on this appeal relates to Item 36 of that stipulation, a payment of $118,840.03 to Todd Shipyards Corporation for repairs at New York to libellant's vessel. The United States War Shipping Administration paid this sum to Todd. This amount was debited on July 19, 1945, by the Shipping Administration against the British Ministry of War Transport. Libellant reimbursed the British Ministry of War Transport by paying it £29,525.9.6 on July 19, 1945.

The district court used as the conversion figure, applicable to this £29,525.9.6, the exchange rate at the date of the decree, September 15, 1950, and computed it at $82,671.33. On this basis, the computations in the decree were as follows:

Total Principal and Interest to
March 7, 1949............. $135,667.90
75% of Principal with Interest
to March 7, 1949........... 101,750.92
Less Payment on Account of
March 7, 1949............. 100,000.00

Balance ............... $ 1,750.92
Interest on Balance from
March 7, 1949, to September
15, 1950 ................. 160.32

$1,911.24

Burlingham, Veeder, Clark & Hupper, New York City (Chauncey I. Clark, New York City, of counsel), Adrian J. O'Kane, New York City, for appellant.

Kirlin, Campbell & Keating, New York City (Raymond T. Greene, New York City, of counsel), Ira A. Campbell, New York City, for appellee.

Irving H. Saypol, U. S. Atty., New York City (Edward L. Smith, Ruth Kearney, New York City, of counsel), for U. S. of America as amicus curiae.

Before SWAN, CHASE and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The collision occurred in British territorial waters between British and American vessels. The British vessel is owned by libellant, a British corporation which has its office and place of business in London, England. The parties have stipulated that the claimant-appellee, owner of the American vessel, is liable for 75% of the damages of libellant, owner of the English vessel. The dispute centers around one item consisting of the amount paid for the repairs, to libellant's ship, made in this country by Todd Shipyards. The other items in issue

here represent expenses and losses incurred in pounds by libellant before devaluation. If the view we take of the rule applicable to Item 36 is correct, our reasoning applies *a fortiori* to those items, and we shall therefore center our discussion on Item 36.

The bill for those repairs, $118,840.03, was not paid to Todd by libellant but was paid to Todd in dollars by the United States War Shipping Administration. This amount was debited by the United States against the credit of the British Government (a credit apparently established under the Lend-Lease agreement). Libellant reimbursed the British Government by paying it £29,525.9.6. At the time of each of those payments, those pounds had an exchange value of $118,840.03. At the date of the decree, due to the intervening devaluation of the pound, £29,525.9.6 had an exchange value of $82,671.33. The district court awarded libellant that sum for that item. Libellant argues that the award should have been $118,840.03.

The type of problem here, because of the time element, has been said to involve a consideration of a "fourth dimension—namely that of time."[1] Since it also apparently involves an attempt to coordinate the currencies of two different national systems, a mathematical-minded legal philospher might suggest the application of the general theory of relativity,[2] which seeks to formulate "laws" for all coordinate physical systems and thus to attain uniformity.[3] Happily, this court is spared any such Einsteinian effort,[4] for the Supreme Court has worked out a solution which we must accept.

It is well settled that a money judgment by an American court must be in American currency.[5] The question there-

[1]. Lord Wrenbury in S. S. Celia v. S. S. Volturno, [1921] 2 A.C. 544, 563. Cf. Liberty Nat. Bank of N. Y. v. Burr, D.C. E.D.Pa., 270 F. 251, 252.

[2]. It is really an anti-relativity, or uniformity, theory.

[3]. See Einstein and Infeld, The Evolution of Physics (1938) 249.

[4]. Cf. Rheinstein, Conflict of Laws In the Uniform Commercial Code, 16 Law and Contemp. Problems (1951) 114, 129, 130–131.

[5]. See e. g., Liebeskind v. Mexican L. & P. Co., 2 Cir., 116 F.2d 971; Guinness v. Miller, D.C.S.D.N.Y., 291 F. 769, 770–771; Frontera Transport Co. v. Abaunza, 5 Cir., 271 F. 199; Nussbaum, Money in the Law (1950) 364–365. Cf. 31 U.S.

fore arises, in a case like this, as to the proper date for conversion of the foreign currency into our own. The controlling authorities in the federal courts are Hicks v. Guiness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168, and Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517,[6] 47 S.Ct. 166, 71 L.Ed. 383. They have been summarized by Williston as follows.[7] The Supreme Court "has held that the exchange value of damages for breach of an obligation performable in foreign currency in the United States is taken at the time of the breach, * * *; but where the obligation is performable in a foreign country in the money of that country, the judgment day rule has been held applicable, on the ground that 'an obligation in terms of the currency of that country takes the risk of currency fluctuation * * * If the debt had been due here and the value of dollars had dropped before suit was brought, the plaintiff could recover no more dollars on that account.' "[8] This court has held that the so-called judgment-day rule applies to unliquidated damages where the cause of action was of foreign origin.[9]

■ The same rules are applicable to tort obligations. See Restatement of Conflict of Laws, § 424. In 40 Harvard L. Rev. (1927) 619, 625 it is said: "Upon the commission of a tort a right arises to damages, expressed in units of the money of the country in which the tort occurred.[10] These damages, primarily expressed in the money of the foreign country, should be translated into money of the forum as of the date when the right is merged in a forum judgment.[11] Conversely, where a tort occurs in the forum, but where damages must be reckoned in terms of foreign money, the right to reparation is expressed in the money of the forum at the date the cause of action arises, and hence the rate of exchange existing on such date should prevail." With that statement we agree.

■ Here we have a foreign tort, a collision in British territorial waters.[12] Accordingly, cases relating to collisions in our waters [13] or on the high seas [14] are inapposite. The English courts seem to

C.A. § 371; Liberty National Bank of N. Y. v. Burr, D.C., 270 F. 251, 252, 253.

In some continental countries the judgment is often for payment in the foreign currency. See Nussbaum, loc. cit. 374ff; Fraenkel, Foreign Moneys in Domestic Courts, 35 Col.L.Rev. (1935) 360 and 386–387; Williston, Contracts (Rev.ed.) § 1410A.

The difference is in part probably due to the fact that, in civil law systems, specific relief is the usual remedy. See Huston, The Enforcement of Decrees in Equity (1915) 6–7, 39–53; Nussbaum, loc. cit. 152ff; cf. Pekelis, Legal Techniques and Political Ideologies, 41 Mich. L.Rev. (1943) 665, 669ff., as to the inefficacy of the Continental method. The reason for the Anglo-American "compulsory conversion" rule is said to be the obsolescence of the action of "debt in the detinet"; Nussbaum, loc. cit., 365.

6. See also Zimmerman v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034.

7. 5 Williston on Contracts (Rev.ed.) 3929–3930.

8. Quoting Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, at page 519, 47 S.Ct. 166, 71 L.Ed. 383.

9. For cases in this Circuit applying the judgment-day rule, see Det Forenede Dampskibs Selskab v. Ins. Co. of North America, 2 Cir., 31 F.2d 658, 659; Thornton v. National City Bank of New York, 2 Cir., 45 F.2d 127, 130; Tillman v. Russo Asiatic Bank, 2 Cir., 51 F.2d 1023, 1025, 80 A.L.R. 1368; The West Arrow, 2 Cir., 80 F.2d 853, 858; cf. Booth & Co. v. Canadian Government Merchant Marine, Limited, 2 Cir., 63 F.2d 240, 241.

10. See The Mandu, 2 Cir., 102 F.2d 459, 463; Restatement of Conflict of Laws, Sections 409, 424.

11. Macdonough-Werfa, 1934 A. M. C. 234, 235; cf. Det Ferenede Dampskibs Selskab v. Insurance Co. of North America, 2 Cir., 31 F.2d 658.

12. See Restatement of Conflict of Laws, § 409.

13. See e. g., The Verdi, D.C.S.D.N.Y., 268 F. 908. There the breach-day rule was applied. Compare it with The Hurona, D.C.S.D.N.Y., 268 F. 910, decided the same day, where a breached contract was to pay francs in France; there the judgment-day rule was applied.

14. Hawaiian-Larchgrove, 1935 A.M.C. 809, 813; Quevilly-Sampson, 1938 A.M.C. 347,

have adopted the breach-day rule.[15] But we may not consider those English decisions, since the conversion date of foreign currency is to be determined by the law of the forum.[16] The New York courts have perhaps adopted the breach-day rule in most circumstances,[17] although a dictum in a recent decision is contra.[18] Whether, in some circumstances, we should, in obedience to Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, apply the state rule, we need not here consider, since we have here a question of general maritime law.

■ The judgment-day rule yields a just result in this case:[19] As libellant has its place of business in England, to award it pounds translated into dollars at the rate of exchange existing in 1944 or 1945, merely because of the happenstance that it libelled claimant's vessel in the United States, would be to give it a windfall of some $36,000. or over £10,000.[20] For, if this suit had been brought in England, the judgment would have been for £29,525.9.6, and not for £29,525.9.6 translated—as of 1944 or 1945—into dollars and then retranslated into pounds, so as

---

354; Restatement of Conflict of Laws, § 410.

15. S. S. Celia v. S. S. Volturno, [1921] 2 A.C. 544; Madeleine Vionnet et Cie v. Wills, [1940] 1 K.B. 72; The Ottoman Bank v. Chakarian, [1930] A.C. 277.

16. Restatement of Conflict of Laws, § 424, Comment.

17. Hoppe v. Russo-Asiatic Bank, 235 N.Y. 37, 138 N.E. 497; Richard v. American Union Bank, 241 N.Y. 163, 167, 168, 149 N.E. 338, 43 A.L.R. 512; Sokoloff v. National City Bank, 250 N.Y. 69, 82, 164 N.E. 745; Richard v. American Union Bank, 253 N.Y. 166, 170 N.E. 532, 69 A.L.R. 667; Parker v. Hoppe, 257 N.Y. 333, 341, 178 N.E. 550, 80 A.L.R. 1359; Parker v. Hoppe, 258 N.Y. 365, 179 N.E. 770, 80 A.L.R. 1359; Dougherty v. Equitable Life Assurance Soc., 266 N.Y. 71, 193 N.E. 897.

18. Matter of United Shellac Corp., 1950, 277 App.Div. 147, 152–153, 97 N.Y.S.2d 817, 822. There the court said: "The question, in such cases, ordinarily resolves itself into whether, in arriving at the amount to be awarded measured by the currency of another country, the foreign exchange is to be translated into American currency as of the date of the breach of contract or the day of the judgment. Where the suit in this country is based upon an obligation existing under foreign law, to be performed abroad, and the jurisdiction of our courts arises merely from 'the fact that the creditor happens to be able to catch his debtor here,' (Die Deutsche Bank Fialiale Nurnberg v. Humphrey, 272 U.S. 517,

519, 47 S.Ct. 166, 71 L.Ed. 383), the amount of the judgment (or award) is adjusted according to the exchange rate which prevails on the day of judgment (Richard v. American Union Bank, 241 N.Y. 163, 149 N.E. 338, 43 A.L.R. 512; Metcalf Co. v. Mayer, supra; Sirie v. Godfrey, 196 App.Div. 529, 188 N.Y.S. 52; Deutsche Bank v. Humphrey, supra). On the other hand, if the contract is to be performed here, then the exchange rate to be applied is that which obtained at the time of default, when the contract was broken (Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168; Hoppe v. Russo-Asiatic Bank, 235 N.Y. 37, 138 N.E. 497, explained on the basis of this distinction in Richard v. American Union Bank, supra; 5 Williston on Contracts, [Rev.ed.], section 1410A)." See also Sirie v. Godfrey, 196 App.Div. 529, 537–538, 188 N.Y.S. 52; Metcalf Co., Limited v. Mayer, 213 App.Div. 607, 613–614, 211 N.Y.S. 53; Restatement of Conflict of Laws, New York Annotations (1935) 273–277.

19. Rifkind suggests that there should be no rigid rule of thumb, and that the judgment-day rule should be rejected when it will work injustice. Rifkind, Money as a Device for Measuring Value, 26 Col. L.Rev. (1926) 558, 559. Cf. 5 Corbin, Contracts (1951) 55–56; Morris, The Proper Law of a Tort, 64 Harv.L.Rev. (1951) 881; Rheinstein, Conflict of Laws in The Uniform Commercial Code, 16 Law and Contemp. Problems (1951) 114, 130–131; Cavers, A Critique of the Choice-of-Law Problem, 47 Harv.L.Rev. (1933) 173, 192–193.

20. See Nussbaum, loc. cit. 405.

to become approximately £42,442.17.6.[21] In each of the English cases in which the breach-day rule has been used, there were facts which compelled consideration of a foreign currency;[22] here, had the suit been in England, there would have been none: The tort occurred in British waters, and the libellant, a British corporation doing business in England, paid the American repair bill in pounds.[23] Libellant should not gain some $36,000 or over £10,000 merely by bringing suit in this country. The "obligation is not enlarged by the fact that the creditor happens to be able to catch his debtor here." [24] Insofar as libellant may suffer because of the shrinkage in the internal purchasing power of the pound,[25] libellant would have

21. See Macdonough-Werfa, 1934 A.M.C. 234, 235.

22. In S. S. Celia v. S. S. Volturno, [1921] A.C. 544, one item of damages was the loss of lire by an Italian ship under hire to the Italian government, which deducted lire for the period when the ship was not operating. In The Ottoman Bank v. Chakarian, [1930] A.C. 277, there was a breach of a contract for a sum payable abroad in Turkish currency. In Madeleine Vionnet et Cie v. Wills [1940] 1 K.B. 72, there was a breach of contract for the price of goods sold in France and payable in French currency.

23. Conceivably the result might be different if the damaged party were engaged in the business of dealing in foreign exchange. Cf. Richard v. American Union Bank, 241 N.Y. 163, 175, 149 N.E. 338, 43 A.L.R. 512; Fraenkel, loc. cit. 364. But we need not and do not so decide.

24. Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 519, 47 S.Ct. 166, 71 L.Ed. 383.

25. Which apparently is far less than the shrinkage in its exchange value. The United States, appearing as *amicus curiae*, has submitted a brief in which it points out that since devaluation, the internal, domestic purchasing power of the dollar has decreased more, on the whole, than has that of the pound. In support of its point, the United States cites tables from the Monthly Bulletin of Statistics, Statistical Office of the United Nations for March, 1951, showing comparative figures for the cost of living and for wholesale prices in the United Kingdom and the United States from September, 1949 when the devaluation took effect. These statistics are in part as follows:

### United Kingdom

| | Cost of Living | | | Wholesale Prices | |
| | All Items | Food | General | Raw Materials | Finished Goods |
| --- | --- | --- | --- | --- | --- |
| **1949** | | | | | |
| Sept. | 112 | 117 | 212 | 236 | 200 |
| Dec. | 113 | 120 | 222 | 250 | 204 |
| **1950** | | | | | |
| Mar. | 113 | 121 | 226 | 262 | 204 |
| June | 114 | 123 | 236 | 294 | 208 |
| Sept. | 114 | 122 | 250 | 377 | 213 |
| Dec. | 116 | 125 | 269 | 462 | 219 |

### United States

| | Cost of Living | | | Wholesale Prices | |
| | All Items | Food | General | Raw Materials | Finished Goods |
| --- | --- | --- | --- | --- | --- |
| **1949** | | | | | |
| Sept. | 165 | 194 | 178 | 191 | 172 |
| Dec. | 163 | 187 | 175 | 188 | 170 |
| **1950** | | | | | |
| Mar. | 163 | 186 | 177 | 192 | 171 |
| June | 166 | 194 | 182 | 198 | 176 |
| Sept. | 169 | 198 | 196 | 214 | 188 |
| Dec. | 174 | 205 | 203 | 221 | 194 |

had no redress in England,[26] and therefore should have none here.

If libellant had paid the repair bill in dollars, or were still obligated to do so, it might perhaps be arguable that libellant would be entitled to be reimbursed in that precise amount of dollars, i. e., $118,840.03; but we need not consider that problem, since it is not before us here. Because of libellant's payment of the bill in pounds, the payment to Todd in dollars drops out of the equation, so to speak.

The United States, in a brief filed as *amicus,* suggests that the result here is peculiarly fair because the devaluation of the pound was part of a "managed currency" plan, so that the decreased foreign exchange rate bore no relation to, and did not affect, the domestic purchasing power of the pound.[27] But although that fact conceivably may be relevant in some other kinds of cases where conversion of foreign currency is necessary, we have not considered it in deciding this case.

Libellant argues that both parties intended conversion into American currency to be at the exchange rate existing at the date of the payment to Todd because, had that not been the intention, the claimant would not have been willing to make payment on account, on March 7, 1949, in so large a sum as $100,000. The argument, at best not too persuasive, omits an important fact: The amount fixed in the decree, before crediting claimant with the $100,000 payment on account, was in excess of that amount, i. e., $101,750.02 for principal and interest to the date of that payment.

The decree was therefore properly for the difference, i. e., $1,750.02, plus interest from March 7, 1949, or a total of $1,911.24.

Affirmed.

Appendix

The stipulation reads in part as follows: "Libel having been filed herein on March 12, 1945, by Shaw, Savill, Albion & Co., Ltd., to recover the amount of the damages sustained by reason of a collision which occurred between its steamship Tamaroa and tank vessel Fredericksburg while the Tamaroa lay at anchor in Bangor Anchorage, Belfast Lough, Ireland, on the morning of January 27, 1944, and cross-libel having been filed herein on October 26, 1945, by Paco Tankers, Inc., as owner of tank vessel Fredericksburg, to recover the damages sustained by said vessel, as a result of the aforesaid collision; and the respective parties hereto having agreed on April 6, 1948, to a settlement of the above-entitled suits on the basis of Paco Tankers, Inc., bearing the damage sustained by it and the Fredericksburg and withdrawing any claim therefor against steamship Tamaroa and her claimant, and in addition thereto paying 75% of the provable damages sustained by steamship Tamaroa with interest thereon to be computed at the rate of 6% per annum from one year after the date of the Tamaroa's various expenditures and losses until paid; and Paco Tankers, Inc., on March 7, 1949, having made a partial payment in the sum of $100,000 on account of the damages sustained by the Tamaroa, in order to avoid the further accrual of interest on said amount pending final agreement on the total of the individual items of damage sustained by the Tamaroa; and the respective parties hereto having thereafter reached an agreement on the nature and amounts of the damages sustained by libellant, Shaw, Savill, Albion & Co., Ltd., as hereinafter set forth,

"It is hereby stipulated and agreed by and between proctors for the respective

26. Perhaps all civilized countries should have "commodity" (or "price-index" or "purchasing power") currency. Cf. Nussbaum, loc. cit., 299ff. But the English courts, and ours, with few exceptions, have adopted the so-called "nominalistic theory," according to which, in purely domestic cases, "a pound is always a pound," or "a dollar is always a dollar," regardless of actually decreased value. See Nussbaum, loc. cit. 182. As to the exceptions, see Nussbaum, loc. cit. 182–183; 48 Col.L.Rev. (1948) 264.

27. See notes 23 and 25, supra.

parties hereto that the damages of libellant, Shaw, Savill, Albion & Co., Ltd., by reason of the matters set forth in its libel herein together with the date of expenditure or loss applicable to each item are as follows:"

Here follow 36 items, the last reading:

"36. Todd Shipyards Corporation, repairs at New York

July 19, 1945 .......... $118,840.03"

The stipulation then continues as follows:

"It is further stipulated and agreed that the costs of repairs to the Tamaroa effected at New York in the sum of $118,-840.03 as set forth above under Item 36, was paid in the first instance by the United States War Shipping Administration; that this amount was debited against the British Ministry of War Transport by the War Shipping Administration and thereafter on July 19, 1945, the British Ministry of War Transport was reimbursed in such amount by Shaw, Savill, Albion & Co., Ltd., libellant herein, as owner of the Tamaroa.

"It is further stipulated and agreed that at all the times when the items of damage expressed above in British Sterling were incurred or paid (excepting items 16, 17 and 20); at all times when the repair bill (Item 36) was paid by War Shipping Administration, when the amount thereof was debited against the British Ministry of War Transport, and when the British Ministry of War Transport was reimbursed for the amount of such debit by Shaw, Savill, Albion & Co., Ltd., libellant herein; at the times when the terms of settlement of the suit were agreed upon between the respective parties hereto on April 6, 1948, and when the payment of $100,000 on account was made by Paco Tankers, Inc., on March 7, 1949, the rate of exchange for the conversion of British Sterling into American currency was $4.-025.

"It is further stipulated and agreed that at all the times subsequent to September 19, 1949, the rate of exchange applicable to the conversion of British Sterling to American currency was $2.80 and that such rate of exchange is applicable to the conversion of the amounts of items 16, 17 and 20 from British Sterling to American currency.

"It is further stipulated and agreed that libellant, Shaw, Savill, Albion & Co., Ltd., is entitled to recover of and from Paco Tankers, Inc., claimant of steamship Fredericksburg, and/or its stipulators for value, 75% of the amount of its damages as above set forth, with interest thereon at the rate of 6% per annum calculated from one year after the date set forth under each of the individual items until March 7, 1949, the date upon which a partial payment of the sum of $100,000 was made by Paco Tankers, Inc., and with interest at 6% per annum upon the balance between said amount of 75% of libellant's damages and the sum of $100,000 from March 7, 1949 until the date of payment thereof.

"It is understood that libellant, Shaw, Savill, Albion & Co., Ltd., contends that the amount of its damages expressed in British Sterling as above set forth, excepting Items 16, 17 and 20, should be converted into American currency at an exchange rate of $4.025; and that the amount of Item 36 constituting the cost of repairs effected at New York by Todd Shipyard Corporation should be allowed and confirmed in the sum of $118,840.03 without any conversion of said sum into British Sterling and reconversion into American currency; that Paco Tankers, Inc., contends that the amount of the items of damage as above set forth expressed in British Sterling (except items 16, 17 and 20) should be converted into American currency at the exchange rate of $2.80 and that the amount of Item 36 in the sum of $118,840.03 should be converted from American currency to British Sterling at the exchange rate of $4.025, being the rate of exchange applicable at the time said amount was debited against the British Ministry of War Transport by the United States War Shipping Administration and the time said debit was paid to the British Ministry of War Transport by libellant herein, making the sum of £29,525.9.6, and that this amount should be reconverted into American currency at the rate of $2.80, the rate of exchange applica--

ble upon the date of this stipulation, making the sum of $82,671.33, said amount to carry interest from July 19, 1946, thereby giving effect to the allowance to claimant of one year's interest from the date of payment of said item by libellant as owner of the Tamaroa.

"It is further understood and agreed that the issue as to the applicable rate of exchange is left to the Court for determination and that libellant, Shaw, Savill, Albion & Co., Ltd., may thereafter enter a final decree herein on the basis of such determination without prejudice to the right of either party to appeal therefrom.

"Dated: New York, N. Y., May 12, 1950."

SWAN, Circuit Judge, dissenting.

I am not convinced that we are bound by controlling authority to accept the judgment date, rather than the date of the tort, to determine the rate of exchange to be applied in converting pounds into dollars; nor do I agree with my brothers' view that the judgment-day rule yields a just result in this case.

Die Deutsche Bank Fialiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 167, 71 L.Ed. 383, which my brothers think controlling, was an action to recover damages for breach of a contract by a German bank to pay marks in Germany on demand. The lower courts held that the debt should be translated into dollars at the rate of exchange existing when the demand was made. Writing for the court Mr. Justice Holmes said that the liability was to pay marks "and was open to satisfaction by the payment of that number of marks, at any time, with whatever interest might have accrued, however much the mark might have fallen in value as compared with other things." His opinion concluded: "Here we are lending our Courts to enforce an obligation (as we should put it, to pay damages,) arising from German law alone and ought to enforce no greater obligation than exists by that law at the moment when the suit is brought." Commentators and lower court decisions are agreed that the reference to "the moment when the suit was brought" was an inadvertence and what was meant was the moment of judgment. This is the source of the judgment-day rule applied by my brothers. The theory of the rule, as I understand it, is that our judgment should be for an amount neither greater nor less but just equal to that which would be rendered under the foreign law. Under the English law, in case of a collision on the high seas, it is held that damages stated in foreign currency (Italian lire) should be converted into sterling at the rate of exchange existing at the date of the loss, i. e. the date of the tort. Celia v. Volturno, 1921, 2 A.C. 554. Had that collision occurred in British territorial waters rather than on the high seas, I cannot conceive that the rule as to the date for converting foreign currency into sterling would have been different. In the case at bar, due to the war, the repairs had to be made in the United States. Todd's bill was paid in dollars, which the British Ministry of War Transport converted into pounds at the rate of $4.025, the rate at the date of the tort as well as at the date of conversion, and pounds were then collected from the libellant. The rate of exchange at which the dollars to pay Todd's bill were purchased, was one of the elements of the libellant's damages. In my opinion the same rate should be used when the pounds paid by the libellant are converted back into dollars in the court's decree. No authority has been cited to support converting at one rate and reconverting at another. If a change in the rate of exchange must result in a windfall for one of the parties, it seems to me fairer to let the injured party benefit rather than the tort-feasor. An additional reason why this seems fair in the case at bar is that the $4.025 rate was still in effect when the parties agreed to settle the suit and when the partial payment of $100,000 was made. I would reverse the decree and direct recomputation of the amount.