Max REISSNER, Appellant,

v.

William P. ROGERS, as Attorney General of the United States and Successor to the Alien Property Custodian, and Ivy Baker Priest, Treasurer of the United States, Appellees.

William P. ROGERS, as Attorney General of the United States and Successor to the Alien Property Custodian, and Ivy Baker Priest, Treasurer of the United States, Appellants,

v.

Max REISSNER, Appellee.

Nos. 15165, 15163.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 4, 1959.

Decided March 10, 1960.

---

Mr. Ernest Fleischman, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for appellant in No. 15,165 and appellee in No. 15,166. Mr. Gerald B. Greenwald, Washington, D. C., was on the brief for appellant in No. 15,165 and appellee in No. 15,166.

Mr. George B. Searls, Attorney, Department of Justice, for appellees in No. 15,165 and appellants in No. 15,166. Messrs. Irwin A. Seibel and Irving Jaffe, Attorneys, Department of Justice, also entered appearances for appellees in No. 15,165 and appellants in No. 15,166.

Before WILBUR K. MILLER, WASHINGTON and BASTIAN, Circuit Judges.

WASHINGTON, Circuit Judge.

These are appeals from grants by the District Court of cross-motions for summary judgment in a suit brought by Mr. Reissner under Section 34(e) of the Trading With the Enemy Act, added by 60 Stat. 925 (1946), as amended, 63 Stat. 107 (1949), 50 U.S.C.A.Appendix § 34 (e), to recover a debt claim against the assets of Schering-Kahlbaum A.G. ("Schering"), a German company, held

by the Office of Alien Property under vesting orders entered during World War II.

The facts as they appear of record may be summarized as follows: Reissner, a man of the Jewish faith, owned all of the stock of a German company called "Anticoman GmbH," which produced a patent medicine called "Anticoman," purportedly an oral remedy for diabetes. On March 1, 1937, Reissner sold to Schering the assets of this company, with certain exceptions, for Reichsmarks (RM) 153,-300. Reissner left Germany shortly thereafter. On February 24, 1948, he filed a claim in the Office of Alien Property against Schering's vested assets. He there contended that the 1937 sale to Schering was void under Section 138 of the German Civil Code because it was *contra bonos mores* and because the inadequate purchase price resulted from Schering's exploitation of Reissner's religious disability; that these acts gave rise to claims in quasi-contract for unjust enrichment under Sections 812, 817, 818 and 819 of the German Civil Code, entitling him to return of the business and, on failure of return, to damages from Schering; and that this is a valid debt claim under Section 34.

The Hearing Examiner of the Office of Alien Property recommended that Reissner's claim be allowed as a debt in the amount of RM 273,507, together with interest at 4% from March 1, 1937, the date of transfer. The Hearing Examiner also recommended that this currency obligation be converted into dollars at the rate of RM 3.33 to $1.00, the exchange rate prevailing in 1948 when the claim was filed. On review, the Deputy Director of the Office of Alien Property agreed with the Hearing Examiner that a debt claim had been stated and that the outstanding debt at the time of transfer was RM 273,507. He ruled, however, that under the German Currency Conversion Law of 1948 this amount was to be converted into Deutsche Marks at the rate of 10 Reichsmarks for 1 Deutsche Mark, and that the Deutsche Marks were to be converted into dollars at the rate

prevailing on the "judgment day." On December 23, 1957, the Attorney General, successor to the Alien Property Custodian, approved the Deputy Director's decision.

In his complaint for review of this decision in the District Court Reissner asserted that the amount of indebtedness as of March 1, 1937, was RM 651,331, that the debt was not subject to the German Currency Conversion Law, and that Reichsmarks should be converted into dollars at the rate of RM 2.50 to $1.00. He asked judgment for $260,533.24 with interest at 4% from March 1, 1937. Following the filing of the Attorney General's answer both parties moved for summary judgment.

The District Court sustained the finding of the Deputy Director that the Reichsmark debt was 273,507. It held, however, that the German Currency Conversion Law was inapplicable, ordered the debt converted at the rate of 3.33 Reichsmarks per dollar, and entered judgment for $82,134.23 plus interest at 4% from March 1, 1937. On appeal Reissner renews his contention that the net value of the property taken by Schering in 1937 was RM 651,331 and that the proper conversion ratio was RM 2.5 for $1.00. The Attorney General urges, *inter alia*, that the finding of the District Court with respect to the amount of the debt as of March 1, 1937, cannot be overturned because it is not clearly erroneous, and that the District Court erred in holding that the German Currency Conversion Law was inapplicable.

Both the Attorney General and the District Court determined that Reissner's claim against Schering was eligible as a "debt claim" within the meaning of Section 34 of the Trading With the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 34, apparently because under German law the claim was a quasi-contractual one for money. We accept the Government's concession here that Reissner has a "debt claim" in some amount which under Section 34 may be paid out of the assets of Schering vested in the Attorney General as successor to the Alien Property Cus-

todian. Our first question then is whether the finding as to the amount of this claim, that is, the finding as to the value of the Anticoman assets on the date of transfer, should be overturned, as Reissner contends.

## I.

■ Section 34(c) of the Trading With the Enemy Act provides for the allowance or disallowance of debt claims by the Custodian after examination of such evidence as may be before him.[1] If the claimant is dissatisfied, he may under Section 34(e)[2] ask review of the disallowance by the District Court. The court may in its discretion take additional evidence upon a showing that the evidence was excluded by the Custodian, was not available to him, or could not reasonably have been presented to him. In the present case no additional evidence was offered to the District Court. Thus, the District Court, and we, may set aside the Attorney General's finding of value only

if on the record before him it was "clearly erroneous." International Silk Guild v. Rogers, 1958, 104 U.S.App.D.C. 330, 262 F.2d 219; Morris Plan Industrial Bank v. Henderson, 2 Cir., 1942, 131 F.2d 975, 977.

The Deputy Director and the Attorney General adopted the determination of value for the transferred Anticoman assets which was made by the Hearing Examiner. The evidence offered by Reissner centered on the profits made by Schering from its sales of "Anticoman" medicine, after the transfer. The indebtedness of RM 273,507 found by the Hearing Examiner was arrived at by ascertaining the figure of RM 426,807 as the profits for the years 1937–1942[3] realized by Schering on the sale of the medicine and subtracting from that figure the RM 153,300 paid to Reissner by Schering. It was not disputed that the figure of RM 153,300 represented the value of the tangible assets on March 1, 1937.[4] Thus, the figure of RM 273,507 was determined

1. Section 34(c) provides:
"The Custodian shall examine the claims, and such evidence in respect thereof as may be presented to him or as he may introduce into the record, and shall make a determination, with respect to each claim, of allowance or disallowance, in whole or in part."

2. Section 34(e) provides:
"If the aggregate of debt claims filed as prescribed does not exceed the money from which, in accordance with subsection (d) of this section, payment may be made, the Custodian shall pay each claim to the extent allowed, and shall serve by registered mail, on each claimant whose claim is disallowed in whole or in part, a notice of such disallowance. Within sixty days after the date of mailing of the Custodian's determination, any debt claimant whose claim has been disallowed in whole or in part may file in the District Court of the United States for the District of Columbia a complaint for review of such disallowance naming the Custodian as defendant. Such complaint shall be served on the Custodian. The Custodian, within forty-five days after service on him, shall certify and file in said court a transcript of the record of proceedings in the Office of Alien Property Custodian with respect to the claim

in question. Upon good cause shown such time may be extended by the court. Such record shall include the claim as filed, such evidence with respect thereto as may have been presented to the Custodian or introduced into the record by him, and the determination of the Custodian with respect thereto, including any findings made by him. The court may, in its discretion, take additional evidence, upon a showing that such evidence was offered to and excluded by the Custodian, or could not reasonably have been adduced before him or was not available to him. The court shall enter judgment affirming, modifying, or reversing the Custodian's determination, and directing payment in the amount, if any, which it finds due."

3. Shering discontinued the production of Anticoman in July, 1942, because of threats to prohibit its use made by a German Commission on Patent Medicines composed of public health authorities, pharmacists, physicians, and representatives of the Ministry of the Interior. It made a few sales, however, in 1943 and 1944.

4. On its provisional balance sheet for 1936, Anticoman valued all its tangible assets at RM 152,964.61 and its "invisible" assets at RM 195,000.

as the value of the intangible assets or goodwill on that date.

■ Reissner contends that the profits made by Schering were RM 654,631, instead of RM 426,807 as found by the Hearing Examiner, the Attorney General, and the District Court. The actual profit made by Schering for the period it produced and sold Anticoman is not shown by the record. The record shows only that Schering grossed a total of RM 1,435,596 from sales of Anticoman during the years 1937 to 1944, inclusive,[5] and that it realized a profit of 45.6% on sales totalling RM 241,064 in 1938 and a profit of 29.8% on sales totalling RM 262,742 in 1939. Reissner would have us apply the ratio of 45.6% to gross sales for all the years 1937–1944, inclusive, to obtain the total profit figure for those years, whereas the Hearing Examiner determined the profit figure by applying 29.8% as the profit ratio to gross sales for the years 1937–1942, inclusive, stating that "considering everything," this was fair in his opinion.[6] Reissner points to nothing in the record before us to substantiate his claim that Schering's profits were at least 45.6% of the gross sales in years other than 1938. He points out that after 1938 Schering allocated to Anticoman sales a percentage of the laboratory research costs in other fields and a larger share of the general overhead expenses, but nothing is shown from which we could conclude that this was improper or that, absent this, the profits would have remained at 45.6% of gross sales for 1939 and subsequent years. Reissner does not suggest any other way for determining the profits, or the value of the business. In the circumstances we cannot characterize the finding as to the amount of Schering's profits as clearly erroneous.

As already indicated, the Hearing Examiner used the profit figure of RM 426,074 for the five-year period 1937–1942 as indicating the combined value of the tangible and intangible assets transferred. Reissner's contention that he was entitled to recover the value of the tangible assets plus Schering's entire profits from the use of the Anticoman assets as damages necessarily connotes either that he is not entitled to be compensated for the value of the intangible assets transferred, or that Schering's profits establish the value of the intangible assets. Neither assumption is tenable. It seems conceded that under Sections 812 and 818 of the German Civil Code Reissner was entitled to receive the value of all assets transferred, both tangible and intangible. Profits are earned by use of all the business assets in combination, both tangible and intangible. There is no valid basis for attributing all the profits earned by Schering exclusively to the goodwill and other intangibles acquired from Reissner.

The two experts on German law who testified in this case agreed that, in addition to the value of the assets transferred and interest at 4%, Reissner under German law would be entitled to such damages as he could prove. Reissner apparently claims all of Schering's profits on Anticoman sales as additional damages. But the Hearing Examiner stated:

"The claimant has not offered evidence of any injury for which he will not be made whole by interest except that which he may have suffered by reason of the delay in payment beyond the reestablishment of

---

5. Gross sales totaled only RM 8,978 in the two years 1943 and 1944.

6. The fact that the Anticoman business was in the process of involuntary liquidation due to professional and governmental opposition to use of the product would suggest that the profit ratio may have fallen below 29.8% in the years after 1939. Reissner's profit ratio on the business in 1936, also a time when the business was subject to governmental harassment because Reissner was Jewish, had been about 18% on the basis of his own profit and loss statement, and 12% on the basis of Schering's adjustments to that statement. There was also testimony that while owned by Schering the sales prices of Anticoman did not change, but the manufacturing costs underwent certain fluctuations, and the total costs were subject to still greater fluctuations.

the German monetary system in 1948, and his residence outside Germany."

This view was accepted by the Attorney General and the District Court, and we perceive no error in their so doing.

■ We conclude that the finding that the amount of the debt due Reissner is 273,507 Reichsmarks with interest at 4% from March 1, 1937, was not clearly erroneous.

## II.

■ We turn to the problems involved in converting the amount of Reissner's compensable claim in Reichsmarks, as of March 1, 1937, to an amount stated in American currency. The initial problem is to determine the appropriate date as of which this conversion from foreign to domestic currency should be made.

In Die Deutsche Bank Filiale Nurnberg v. Humphrey, 1926, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383, where suit was brought under Section 9 of the Trading With the Enemy Act for breach of contract to pay foreign currency in the foreign country, the Supreme Court held that the amount recoverable in foreign currency was to be converted into dollars at the rate of exchange on the date judgment was entered. And we have applied this so-called "judgment day rule" in converting into dollars a foreign currency claim created by foreign law. See Straehler v. Brownell, 1957, 100 U.S.App. D.C. 394, 246 F.2d 675, affirming a decision of the District Court, No. 774–56, dated June 29, 1956 (D.D.C.) (a proceeding under Section 34). Other courts have reached similar conclusions. See Paris v. Central Chiclera, 5 Cir., 1952, 193 F.2d 960; Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg, 2 Cir., 1951, 189 F.2d 952; Indian Refining Co. v. Valvoline Oil Co., 7 Cir., 1935, 75 F.2d 797; Tillman v. Russo Asiatic Bank, 2 Cir., 1931, 51 F.2d 1023, 80 A.L.R. 1368, certiorari denied, 1932, 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932. See also International Silk Guild v. Rogers, 1958, 104 U.S.App.D.C. 330, 335, 262 F.2d 219, 224; Note, 40 Harv.L.Rev. 619, 621–25 (1927); 5 Williston on Contracts 3927–31 (Rev.ed. 1937); Restatement, Conflict of Laws § 424 (1934). The view urged here that Deutsche Bank has been misread and that it really established as the conversion date the date on which the claim was filed has been considered and rejected in several of the cases cited above. We think that question is now to be regarded as settled, and that we are bound to apply the judgment date rule in cases like the present.

In this case there is no question that Reissner's underlying claim against Schering was given him by German law and that the liability was to pay him the amount of the debt in German currency. The "judgment day" rule of Deutsche Bank thus seems clearly applicable.

■ The District Court was the first tribunal to enter a "judgment" in the strict sense in this case. But prior thereto the Attorney General as successor to the Custodian was charged under Section 34(c) with the responsibility of making a determination of allowance or disallowance of the claim in whole or in part. He did so on December 23, 1957. The judgment in the District Court was entered in a review of the Attorney General's decision. In cases instituted in the District Court to establish a claim initially, the date of the judgment of the District Court is the judgment date for purposes of conversion, whether or not that judgment is thereafter modified, affirmed, or reversed. Paris v. Central Chiclera, supra; Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg, supra; Indian Refining Co. v. Valvoline Oil Co., supra; Tillman v. Russo Asiatic Bank, supra. We think that the Attorney General's decision to allow the claim in this case corresponds to the District Court's judgment in the cited cases as the first final judgment subject to review, and that the Schering debt in German currency is to be converted into dollars at the rate of exchange on the date of the Attorney General's decision.

### III.

The conversion problem does not end, however, with a determination that Reissner's claim in German currency is to be computed in dollars as of the judgment day. The rate of exchange must still be considered. The holding in Deutsche Bank, supra, would seem to imply that a debt claim such as Reissner's is subject to modification by change in the currency system of the foreign country prior to judgment. Here, prior to judgment, the German currency system was, in fact, altered so that Reichsmarks—the currency in which Reissner's compensable injury was originally computed—were replaced by Deutsche Marks as legal tender. Under the law establishing the new currency,[7] Reichsmarks "debts and claims arising out of debts" were to be converted into Deutsche Marks at the rate of 10 Reichsmarks to one Deutsche Mark.[8] If, under German law, Reissner's claim against Schering was a debt or claim arising out of a debt, then clearly its amount in Reichsmarks was convertible into Deutsche Marks at the prescribed ratio. If, on the other hand, Reissner's claim fell within certain other categories, it would be convertible at the rate of 1 Deutsche Mark for 1 Reichsmark.[9]

The determination of the Attorney General that under the German Conversion Law Reissner's claim was a debt claim subject to conversion at the 10 to 1 rate was a finding of fact,[10] of a sort which on review may not generally be overturned unless clearly erroneous. Remington-Rand, Inc. v. Societe Internationale Pour Participations Industrielles et Commerciales S.A., 88 U.S.App. D.C. 275, 188 F.2d 1011, certiorari denied, 1951, 342 U.S. 832, 72 S.Ct. 44, 96 L.Ed. 630 (action under Section 9(a) of the Trading With the Enemy Act); Note, 72 Harv.L.Rev. 318, 322–24 (1958). Cf. International Silk Guild v. Rogers, supra.

We conclude that the District Court was not justified in reversing the finding as clearly erroneous. The finding is in accord with decisions of the Supreme Federal Court of Western Germany rendered in 1952, 5 BGHZ 197; 6 BGHZ 227; 7 BGHZ 256, and decisions of the Supreme Court of the British Zone of Germany rendered in 1948, 1 OGHBZ 198, and in 1950, 3 OGHBZ 275; it is supported by the opinion and testimony of one of the expert witnesses, based on these cases and other authorities cited by her.[11] Reissner's claim was asserted in quasi-contract on a theory of unjust en-

---

7. Military Government Law No. 63 was issued on June 27, 1948, for the American and British Zones of Germany, and is printed in 13 Fed.Reg. 4965 at 4971. The law applicable here is the Second Ordinance of the Commandants of the American, British, and French Sectors of Berlin dated July 4, 1948 (known as the Berlin Conversion Ordinance). Insofar as material here, the language of the two laws is said to be virtually identical. The provisions of Law No. 63 only will hereafter be cited.

8. Article 16 of Military Government Law No. 63 provided that "Reichsmark claims shall be so converted into Deutsche Mark claims that the debtor shall be obliged to pay to the creditor one Deutsche Mark for every ten Reichsmarks due." Article 13 defined Reichsmark "debts and claims" as "all debts and claims arising out of debts incurred before June 21, 1948, which are expressed in Reichsmarks * * *." See 13 Fed.Reg. 4965, 4973.

9. Obligations for payments of wages, salaries, rent, social security pensions, annuities and the like coming due after June 20, 1948; obligations arising out of contracts of purchase or for work where performance of the contract or work was made after June 20, 1948; and obligations arising out of settlements between partners, heirs, married persons, legatees and the like. Art. 18 of Law No. 63; see 13 Fed.Reg. at 4973.

10. See Black Diamond S.S. Corp. v. Robert Stewart & Sons, 1949, 336 U.S. 386, 396–397, 69 S.Ct. 622, 93 L.Ed. 754; Cuba R. Co. v. Crosby, 1912, 222 U.S. 473, 479, 32 S.Ct. 132, 56 L.Ed. 274.

11. E. g., Graue, Germany: Delimitation of Unjust Enrichment Claims, 3 Am. Journal of Comparative Law 95–97 (1954); Palandt's Kommentar (12th ed. 1954), § 818, note 5c; Harmening-Duden, Die Wahrungsgesetze 184–85 (1949).

richment and, as the decisions mentioned above point out, it is a claim for money as a substitute for the original thing, if restitution is not possible, and as such is a debt convertible at the 10 to 1 ratio. If such a claim were not a debt for purposes of German law, it would indeed be anomalous that it could qualify as a debt for purposes of Section 34. And of course the policy underlying Section 34 would hardly contemplate that a "debt claim" within the scope of that section would include compensation for the depreciation of German currency prior to the time the claim was recognized as valid. See International Silk Guild v. Rogers, 104 U.S.App.D.C. at page 337, 262 F.2d at page 226 (separate opinion).

For these reasons, the judgment of the District Court will be affirmed in part, reversed in part, and the cause remanded.

So ordered.